ROY J. SMILEY *et al.*, Plaintiffs, *v.* MANCHESTER INSURANCE & INDEMNITY COMPANY OF ST. LOUIS, Defendant and Third-Party Plaintiff-Appellant.—(WILLIAM D. KNIGHT, JR., Third-Party Defendant-Appellee.)

Second District   No. 76-62

Opinion filed June 16, 1977.

Barrick, Jackson, Switzer & Long, of Rockford, for appellant.

Robert K. Skolrood, Robert A. Frederickson, and John B. Roseberg, all of Reno, Zahm, Folgate, Skolrood, Lindberg & Powell, of Rockford, for appellee.

Mr. JUSTICE GUILD delivered the opinion of the court:

This is an appeal from a third party action against William D. Knight, Jr., an attorney, by the Manchester Insurance & Indemnity Company of St. Louis (hereinafter referred to as Manchester) for malpractice.[1] In its third-party complaint Manchester alleged that Knight negligently handled the defense of a personal injury suit and a wrongful death suit against the estate of one Charles Toney, one of Manchester's insureds. Knight filed a counterclaim against Manchester for fees claimed to be due him as a result of services rendered to Manchester. After trial on these issues the jury returned a verdict in favor of Knight in the malpractice suit and another verdict in favor of Manchester on Knight's counterclaim. On appeal Manchester argues that the trial court erred in failing to grant Manchester's motion for a directed verdict on Knight's liability and further erred in denying a motion for a judgment notwithstanding the verdict on the question of Knight's liability. Alternatively, Manchester argues that the trial court erred in failing to grant Manchester's motion for a new trial on damages alone; and also alternatively Manchester argues that the trial court erred in failing to grant Manchester's motion for a new trial on all issues as a result of the admission of erroneous evidence, the denial of several of Manchester's instructions and the giving of Knight's instruction No. 13.

■■ In *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 309-10, 356 N.E.2d 32, 35-36, our supreme court recently discussed the standards in determining when a trial court should enter a directed verdict or judgment notwithstanding the verdict and a new trial. The court first stated, in quoting *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 229 N.E.2d 504, 37 Ill. 2d 494:

> " 'In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' "

The court discussed the difference between granting a directed verdict or a judgment notwithstanding the verdict and a new trial. The court reiterated its statement in *Pedrick* that:

> "There is, in our judgment, excellent reason for so differentiating to be found in the radically different results of allowance of the two motions, and we believe a more nearly conclusive evidentiary

---

[1] For a discussion of the underlying suits see *Smiley v. Manchester Insurance & Indemnity Company* (1973), 13 Ill. App. 3d 809, 301 N.E.2d 19, where this court affirmed the trial judge's entry of a summary judgment against Manchester.

situation ought to be required before a verdict is directed than is necessary to justify a new trial."

The *Mizowek* court then stated:

"On a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence."

In applying these two standards to the case at hand, we find that all of the evidence, when viewed in its aspect most favorable to Knight, so overwhelmingly favors Manchester that no contrary verdict based on the evidence could ever stand. We therefore hold that the trial court erred in denying Manchester's motion for a directed verdict on Knight's liability and subsequently denying Manchester's alternative motion for a judgment notwithstanding the verdict.

The record reveals that the original lawsuit arose out of an automobile accident on February 13, 1967, when an automobile driven by Charles Toney crossed the center line of the road and collided with another automobile. Charles Toney was killed in the accident and his two passengers, Lemeau and Isizira Arnold, were both injured. Roy J. Smiley and Byron Emanuel were in the other automobile. Smiley was injured and Emanuel was killed. Attorney Bernard P. Reese, Jr., represented both Smiley and Emanuel's estate in the lawsuits which ensued. At first Reese attempted to negotiate a settlement with the insurance company adjuster, Bill Eastman. Reese initially offered to settle Smiley's claim for $16,000 and Emanuel's estate claim for $30,000. After Reese discovered that the only asset in Toney's estate was an insurance policy with Manchester with limits of $10,000 per person and $20,000 per accident, Reese tried to settle for the policy limits. Reese refused to sign a release but offered to sign a covenant not to sue. Reese explained to Eastman that he hoped that the insurance company would refuse all his demands to settle, allowing him to go to trial, receive a judgment for his clients' entire injuries and make the insurance company pay the entire judgment because of their bad faith negotiations to settle within the policy limits. Eastman made a full report of this to the insurance company. Manchester refused to settle the case on Reese's terms and refused to make a counteroffer of settlement. Reese then filed suit praying for $100,000 judgment for the wrongful death of Emanuel and $50,000 for the personal injuries to Smiley.

Manchester assigned the case to attorney Knight on November 16, 1967. In the file Knight received from Manchester was Eastman's report indicating that Eastman, the adjuster, felt that it was a case of liability, listing Reese's offer to settle and discussing Reese's plan to make the insurance company pay the entire judgment he received for their bad faith negotiations and refusal to settle within the policy limits. Knight prepared a motion to strike the complaint and after it was denied made

his own report on the file. He concluded that it was unclear who was liable without further facts.

On November 27, 1967, before Knight undertook discovery, he received notice that the Arnolds, the passengers in the Toney car, had been injured in the accident and that they were represented by attorney Clifford E. Stoner. At that time no suit had been filed by Stoner in behalf of the Arnolds and it was unclear to Knight that he had authority to represent Manchester in negotiations with the Arnolds. On December 6, 1967, William Blackwell, claims supervisor for Manchester, sent Knight a letter stating that Manchester felt that:

> " * * * we should probably make some effort to get the claimants together, and make some disposition of all claims, and effect whatever savings of the policy limit possible for a final disposition, as far as we are concerned.
>
> Please proceed with your handling, with the above in mind and keep us advised."

Blackwell testified that about November 27, 1967, he discussed the case with Knight and stated that he "suggested possibly he [Knight] try to get all of the claimants, those involved in the suit, together, and see if some settlement couldn't be made." This was never done.

In discovery, Knight determined that there was an independent witness who stated that the Toney automobile was on the wrong side of the road at the time of the accident. He also found out that the deceased, Byron Emanuel, was 24 years old, had one male child aged 3½, earned $125 per week and his estate incurred $3,200 in bills after the accident; that Smiley had incurred $1600 in medical bills and $2000 in lost wages since the accident; and that the Arnolds had never made a demand to settle nor had filed a suit on their claims.

On June 4, 1968, the suits on behalf of Smiley and Emanuel's estate were set for trial on June 24, 1968. Knight informed Blackwell and asked for instructions. Blackwell instructed Knight on June 18, 1968, in a telephone conversation that Knight had authority to settle all claims arising from the accident up to $20,000. Blackwell told Knight he could use up to $17,000 to settle Smiley and Emanuel's estate claims and should reserve $3000 for any claims that the Arnolds might make against Manchester.

On June 21, 1968, Reese renewed his demand to settle for the policy limits, Knight did not counteroffer. Knight explained that it was Reese's position not to settle either case individually nor to settle for less than the policy limits. That same day Blackwell and Knight had a controversial telephone conversation. Blackwell's version of the conversation was that Knight explained what Reese's demands were, but Blackwell could not remember whether or not Knight told him that Knight did not offer the $17,000 settlement to Reese. Blackwell testified he then gave Knight

authority to settle Smiley and Emanuel's estate claims for the policy limits of $20,000 at a propitious moment. Blackwell said that that day he mailed Knight a letter confirming the conversation giving Knight the $20,000 authority. Knight received the letter in the afternoon of June 25, after the jury had retired but before they had returned with the verdict. Knight's version was that after explaining Reese's position and that he had not offered the settlement of $17,000, Blackwell told him to "try the case; go all the way." Knight testified that after the conversation he did not attempt to settle and proceeded to try the case. On June 24 Reese renewed his demand to settle each case for $10,000 in court before the judge and the court reporter. The record discloses that Knight testified that on June 25 at 3 p.m. he received the letter from Blackwell. It read:

"6/21/68 Confirming our conversation this date, you do have auth. to offer our policy limits of 20,000.00 to dispose of the pending suits should the need arise.      /s/W. C. Blackwell"

Knight testified that he did not call Blackwell to protest that the letter did not properly represent the conversation on June 21, 1968. Knight explained that the letter only covered part of the conversation but did not conflict with his instructions to "try the case, to go all the way." Knight never made an offer to Reese to settle both claims for the policy limits and at 5 p.m. on June 25 the jury returned verdicts in favor of Smiley for $25,000 and Emanuel's estate for $55,000. The trial judge entered a judgment for Smiley for $25,000 and a judgment for Emanuel's estate for $30,000, the existing statutory limit for wrongful death. Manchester paid the judgment to the extent of the policy coverage; $10,000 per person, $20,000 per accident, plus interest on the judgments. Thereafter Reese arranged for Toney's estate to assign all claims that estate had against Manchester to his clients. Reese then filed suit in behalf of Smiley and the estate of Emanuel as Toney's estate's assignee, against Manchester for bad faith negotiations to settle the claims within the policy limits and asking for a judgment against Manchester for the unpaid balance of each judgment plus interest. Knight was retained to defend the suit at first but was later replaced.

Manchester then filed a third-party suit against Knight for malpractice and Knight counterclaimed for attorney's fees due and owing for services rendered to Manchester.

During the pendency of the suit Reese offered to settle both claims for $18,000. Manchester refused to settle and the case went to trial. At the trial on the malpractice suit, attorney Ohlson testified for Manchester as an expert witness. It was his opinion that, based upon a hypothetical question incorporating the factual background of the original case and the facts that the attorney handling the case in fact had authority to settle the case for $17,000 on June 18 and $20,000 on June 21 and received the letter

on June 25 confirming the $20,000 authority, that Knight was guilty of malpractice because his actions directly exposed Manchester to excess liability above the policy limits. Attorney Reese testified as a witness for Knight. He testified that prior to and throughout the trial there was nothing about Mr. Knight's actions that were not in accordance with the usual customary practices used by defense lawyers in the handling of this type of case. Reese also testified:

> "I was puzzled with the company's attitude, and I thought they ought to pay off both claims at the policy limits."

Later Reese stated that he was puzzled about the company's position but because of the ethical considerations, he couldn't call Manchester and say, "Hey, what are you guys doing?"

The case was given to the jury and they returned a verdict in favor of Knight in the malpractice suit and a verdict in favor of Manchester on Knight's counterclaim. Only Manchester has appealed.

■■ Based upon the above facts, it is clear to this court that attorney Knight was authorized to make an offer of settlement for $17,000 for both Emanuel's estate and Smiley's claims on June 18, 1968. At no time, did attorney Knight communicate this authority to attorney Reese who was handling the case for the plaintiffs. Furthermore, on June 21, 1968, Knight was given authority to settle the cases for $20,000 and refused to communicate this information to Reese at any time prior to the return of the verdicts. It is interesting to note that in the original trial Reese made a demand on the record to settle both cases for $10,000 prior to trial on June 24 and that attorney Knight refused to comment upon his authority to settle the case. On June 25, prior to the return of the verdict, Knight received written confirmation of his authority to settle the case for the policy limits and neglected to communicate his authority to either the judge or to Reese. Knight's inaction in the handling of this matter directly caused the insurance company to incur liability for bad faith negotiations in attempts to settle the disputed claims within the policy limits. Attorney Ohlson specifically testified that Knight's conduct did not, in fact, conform with those standards used by the lawyers in that community. Furthermore, Reese also mentioned his confusion and puzzlement over the handling of the case but testified he could not unravel the puzzle due to the ethical consideration of being unable to contact Mr. Knight's client directly. Thus, all of the evidence, when viewed in an aspect most favorable to Knight, so overwhelmingly favors Manchester that no contrary verdict based on this evidence could ever stand on the issue of Knight's liability to Manchester.

Manchester next contends that the trial court erred in denying Manchester's motion for a new trial on the issue of damages. Manchester argues that the trial court erroneously admitted evidence of Reese's offer

to compromise the suits in excess of the policy limits for $18,000, and Manchester's refusal to discuss any settlement of those suits. Manchester relies upon *Hill v. Hiles* (1941), 309 Ill. App. 321, 32 N.E.2d 933, to support its contention that:

> "Offers of compromise are not admissible due to the fact that an offer of compromise is not actually an admission but merely an effort to buy one's peace and therefore is irrelevant to the case at hand; and further because public policy favors such compromises and in that light they should be considered inadmissible."

Knight argues that the evidence of the offer to compromise the excess suit and Manchester's total refusal to consider a compromise has independent relevance to prove Manchester's failure to mitigate damages.

■■ We are thus faced with an apparent conflict between two well settled legal principles, the one that offers of compromise are not admissible in evidence (*Hill v. Hiles*), and the other, the failure to mitigate damages is a partial defense to the suit for the excess judgment. *Kelly v. Chicago Park District* (1951), 409 Ill. 91, 98 N.E.2d 738; *Costanzo v. Friel* (1947), 331 Ill. App. 22, 72 N.E.2d 57 (abstract); and *Elgin, Joliet & Eastern Ry. Co. v. American Commercial Line, Inc.* (N. D. Ill. 1970), 317 F. Supp. 175.

■■■ The underlying purpose for the rule requiring the exclusion of offers to compromise is to avoid the prejudicial effect that such evidence has upon the jury in determining the issue of liability. (*Hill v. Hiles*.) We are of the opinion that the rule allowing the admittance of evidence of failure to mitigate damages must yield to the public policy inherent in the rule that the offers of compromise in settlement with third persons may not be shown except under unusual circumstances. We do not find that such unusual circumstances existed in the trial of this suit. We therefore hold that the evidence of the offer of compromise in the case before us was inadmissible in the trial for the excess because of the prejudicial effect it did have upon the jury in determining the issue of liability. We further hold that a new trial on the issue of damages alone should be held. However, we note that on remand for a new trial on damages the purpose for excluding the offer to compromise the suits in excess of the policy limits will no longer exist. We therefore hold that the evidence of the offer to compromise will be admissible on the issue of mitigation in the new trial on damages.

All of the plaintiff's other contentions deal with the issue of whether or not the trial court properly instructed the jury on the issues of liability. We find it unnecessary to pass upon these contentions in light of the above holding herein.

For the above reasons we reverse the judgment of the trial court on the plaintiff's motion for a directed verdict and subsequent motion for a

judgment notwithstanding the verdict. We order a new trial on the issue of damages alone.

Reverse and remand with instructions.

RECHENMACHER, P. J., and SEIDENFELD, J., concur.