ROBERTA LEVENSON, Plaintiff-Appellant, *v.* LAKE-TO-LAKE DAIRY COOPERATIVE, Defendant-Appellee.

First District (5th Division)   No. 78-253

Opinion filed September 14, 1979.

John D. Hayes & Associates, Ltd., of Chicago (John D. Hayes and Louis Hilfman, of counsel), for appellant.

Menk, Bishop and Kezelis, of Chicago (John Cadwalader Menk, of counsel), for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Plaintiff brought an action to recover damages for personal injuries sustained as a result of the alleged negligence of defendant's pilot when the airplane operated by the pilot crashed into an apartment building in which plaintiff resided. Following a jury trial, judgment was rendered in favor of defendant and plaintiff's post-trial motion was subsequently denied. On appeal plaintiff contends that: (1) the trial court committed reversible errors; and (2) defense counsel's closing argument was improper. We affirm the judgment of the trial court. The following evidence was adduced at trial.

On the morning of February 15, 1967, a single engine aircraft owned by defendant Lake-to-Lake Dairy Cooperative and operated by defendant's pilot, Clarence J. Elliott, took off from Chicago Meigs Field and shortly thereafter crashed into a high-rise apartment building known as Hollywood Towers located at 5701 N. Sheridan Road in Chicago. The point of impact occurred at the 16th floor and plaintiff, Roberta Levenson, lived in an apartment on the 15th floor. As a result of the crash, Elliott was killed and plaintiff allegedly suffered a heart attack and subsequent strokes. In plaintiff's first amended complaint, she alleged res ipsa loquitur and specific negligence.

PLAINTIFF'S CASE

Irving Rutz, an air traffic control specialist for the Federal Aviation Association (FAA), testified that on February 15, while working at the Joliet Flight Service Station, he received a telephone call at 6 a.m. from Elliott requesting local weather and weather for Visual Flight Rules (VFR) en route to Sheboygan, Wisconsin. He gave the 5:50 a.m. O'Hare weather as a measured ceiling of 900 feet overcast and an 8-mile visibility. He also gave a forecast calling for ceilings of 1000 feet overcast and a 5-7 mile visibility and fog. He then gave the 4:58 a.m. Milwaukee forecast as a ceiling of 1100 feet and a 12-mile visibility and the 4:55 a.m. Green Bay forecast as a ceiling of 1600 feet and a 15-mile visibility.

At 6:51 a.m., Rutz received another telephone call from Elliott requesting weather information. Rutz gave him the 5:55 a.m. Meigs' forecast as an estimated ceiling of 800 feet overcast and a 7-mile visibility; the 5:58 a.m. Milwaukee forecast as a ceiling of 1000 feet overcast and a 12-mile visibility; and the 5:55 a.m. Green Bay forecast as a ceiling of 1500 feet overcast and a 15-mile visibility. In addition, Rutz gave Elliott certain weather advisories which warned of possible turbulence, icing, and low ceilings in the area. He also told Elliott that the Chicago area weather was for Instrument Flight Rules (IFR) and Elliott advised him that he could get a special VFR clearance[1] to depart. Rutz further stated that to his knowledge the information given to Elliott was such that it came within the limits of a special VFR clearance.

Bernard L. Stitch, an air traffic control specialist at Meigs Field, testified that on the morning of February 15, he received a telephone call at 7:07 a.m. and a radio transmission at 7:17 a.m. from Elliott. During the telephone conversation, Elliott requested weather information and Stitch gave him the 6:55 a.m. Meigs' forecast which was a ceiling of 500 feet overcast and a 2½-mile visibility with haze. At the time, the weather was

[1] This type of clearance is only valid within the control zone at Meigs Field, which was a 3-mile radius from the center of the airport. It guarantees to the pilot that there are no unauthorized airplanes within the control zone, (as defined by witness Bernard L. Stitch).

IFR, which meant that the ceiling was less than 1000 feet and the visibility was less than 3 miles.

At 7:23 a.m. Elliott radioed the tower ready for takeoff and Stitch cleared him and requested a report from him upon leaving the control zone. At 7:26 a.m. Elliott reported leaving the control zone and at about 7:30 a.m. the crash occurred.

Thomas J. Minoia, an experienced pilot since 1942, testified that on February 15 he observed defendant's airplane in flight from his apartment which was located near Montrose Avenue (4400 north) and Marine Drive. He estimated the weather to be a ceiling of 350-400 feet and a visibility of 3 blocks. When he first observed the airplane, it was flying at about 350-400 feet above the Outer Drive in a northerly direction. When the airplane passed his building it was flying at its cruising speed. He later observed the airplane as it disappeared from view into the haze, flying in a slightly nose-down attitude. According to Minoia, the pilot was probably using the shoreline of the lake as a guide. Under the prevailing weather conditions, the only way the pilot could maintain a view of the shoreline would be to look straight down because he would not be able to see anything ahead of him.

After the airplane disappeared from view, Minoia left the room and about 10 minutes later his wife informed him that there had been an airplane crash. He arrived at the scene of the crash at about 9:30 a.m. and spoke with an FAA investigator whereupon he identified the wreckage as the same airplane he had observed from his apartment.

The evidence deposition of Victor Lazar was read to the jury and into the record. In February of 1967, he was an investigator for the Civil Aeronautics Board (CAB). He was assigned to investigate the crash and arrived at the scene at approximately 8 a.m. Through witnesses, he determined that the crash occurred at approximately 7:30 a.m. Upon an examination of the trajectory and wreckage scatter pattern, he determined that the primary point of impact occurred at the 16th floor of 5701 N. Sheridan Road and the secondary point of impact occurred at approximately the same level of 5733 N. Sheridan Road. He further determined that at the time of impact, the airplane was in a right turn with an angle of bank of approximately 30° and a 10° nose-down attitude. An examination of the remains of the aircraft structure and systems revealed no factual evidence of in-flight structural failure or systems malfunction. Also, the condition of the spark plugs indicated that the engine was functioning properly.

Jesse W. Stonecipher, a professor and associate director of the Institute of Aviation of the University of Illinois, testified as an expert witness. He stated that a pilot who does not hold an IFR or instrument rating is not authorized to operate an aircraft under IFR conditions. A

special VFR clearance acts as a waiver of the basic IFR minimums and will enable the pilot to clear the control zone. The minimum required for a special VFR clearance is a visibility of at least 1 mile and the operation must be conducted clear of clouds. A controller is required to grant a special VFR clearance where visibility is 1 mile or more unless there is conflicting traffic within the control zone. The VFR minimums outside the control zone in a congested area are a 3-mile visibility and an altitude of at least 1000 feet above the highest building within 2000 feet horizontally. There are no altitude restrictions where a pilot is flying over the open water more than 2000 feet from any building, so long as he does not come within 500 feet of a ship or vessel.

According to Stonecipher, a takeoff and a flight executed in the weather conditions existing at the time the pilot took off and the route he flew could not be conducted with a reasonable degree of safety. He based his opinion on the fact that the pilot overlooked certain important signposts prior to departure. First, he failed to obtain the area forecast for the area in which he planned his flight. Secondly, he failed to note that the weather at Green Bay had deteriorated considerably in the space of one hour just prior to takeoff. Thirdly, the significant decrease in ceiling and visibility at Meigs Field should have been an indication that the weather was deteriorating in the general area of Chicago.

In Stonecipher's opinion, a non-instrument-rated pilot should not have attempted the flight. Nonetheless, the pilot in this instance should have either executed a 180° turn and returned to Meigs Field or contacted air traffic control by radio, declared an emergency and requested radio guidance to an airport for landing.

Plaintiff, Roberta Levenson, testified that on the morning in question, as she was going into the dining room of her apartment, she heard a tremendous explosion and fell to the floor. She then experienced a gripping and tightness in her chest which continued throughout that day. By evening, her condition had become more pronounced and had spread to her arms. After her regular doctor's appointment on the following day, plaintiff was admitted to Edgewater Hospital. She stated that prior to that time she had never experienced a similar tightness in her chest or pain in her arms.

Herman Levenson testified that on the day in question he left his apartment for work at about 7:10 a.m. It was extremely foggy and there was still a lot of snow on the ground from the snowstorm. While waiting outside of his building for a friend to pick him up, he heard a tremendous explosion and saw an enormous amount of debris and various objects falling down the corridor between the two buildings. He ran to the east end of the building and saw the fuselage of an airplane falling in the direction of where he was standing. As he looked up, he saw some debris,

part of a window frame, and part of the building hanging in the general area of where his apartment was located and it appeared as though the airplane had hit his apartment. He then went immediately to his apartment and upon arriving, he saw plaintiff standing between a chair and the dining room table and she appeared to be in a state of shock. He gave her a Librium tablet, some medication that had been prescribed for his heart condition, in hopes that it would help relax her.

At about 11 p.m., Levenson was awakened by plaintiff and was told by her that she was not feeling well. She appeared to be perspiring heavily and her feet were cold. Levenson gave her another Librium tablet and tried to comfort her. On the following day, he accompanied plaintiff on her regular doctor's appointment, after which time she was admitted to Edgewater Hospital and 9 days later she suffered a stroke. As a result, plaintiff lost complete control of her right side and she could no longer speak.

During her convalescence, plaintiff was taken care of by a practical nurse and she began to show some slight improvement in her speech and in the paralysis of her right side. However, 3 weeks after her discharge from the hospital, Levenson came home one evening and found plaintiff lying in bed unable to move her legs, her speech was impaired and her jaw had dropped. He called Dr. Rosenblum, who came to their apartment, examined plaintiff and suggested that she return to the hospital. After her discharge on this occasion, plaintiff was transferred to the Chicago Rehabilitation Institute where she remained for 3 1/3 months. Over the next several years plaintiff showed gradual improvements in her condition.

Levenson further stated that prior to the accident, plaintiff's activities were the same as any other woman her age and that she experienced ailments similar to those of other women. Since the accident, plaintiff has experienced mood changes, lapse of memory, and her ability to write has been greatly impaired.

Dr. Alfred Rosenblum, plaintiff's family physician since 1960 and treating physician following the crash, testified that plaintiff had a medical history of thyroid deficiency and hypertension. In 1962, plaintiff was admitted to Edgewater Hospital with a diagnosis of tracheobronchitis. During the course of that hospitalization, EKG's were taken and the results suggested some coronary insufficiency.

Plaintiff was next hospitalized under Dr. Rosenblum's care in 1965 for a recurrence of her previous condition. EKG's were also taken, however, the results revealed no coronary insufficiencies. Plaintiff was next hospitalized from February 16, 1967, until April 29, 1967, diagnosed as having suffered a heart attack and a stroke. After her discharge, Dr. Rosenblum saw plaintiff on May 22 at which time the results of her EKG

indicated that her condition had slightly improved. On that same day, however, plaintiff developed a recurrence of her stroke which resulted in the complete loss of control of her right arm and leg. Thereafter, plaintiff was hospitalized and discharged on July 12 to the Rehabilitation Institute of Chicago for further rehabilitation treatments. Plaintiff remained under Dr. Rosenblum's care until July 18, 1969, shortly before her relocation to Florida.

During cross-examination the court permitted defense counsel, over the objection of plaintiff's counsel, to question Dr. Rosenblum as to the contents of a medical history of plaintiff which was prepared by another physician and signed by Dr. Rosenblum. The relevant testimony was as follows:

"Q. Would it be significant to you to receive a history of a tightening of the chest and a pain radiating down the arm two weeks before the incident we're talking about?

A: Yes.

Q: Why would it be significant?

A: Might indicate some preliminary or premonitory symptoms.

Q: Forerunner?

A: Yes.

Q: And isn't that what that history shows?

A: Yes."

Dr. Paul L. Rodensky, plaintiff's physician from 1969 until the time of the trial, testified that on January 22, 1974, plaintiff was seen in his office and there was evidence that she had experienced another stroke. In response to a hypothetical question, Dr. Rodensky stated that in his opinion, the airplane crash was the sole precipitating factor in the development of plaintiff's heart attack and all of the resulting complications.

## DEFENDANT'S CASE

Margret Weiler testified that in February of 1967 she lived in an apartment on the 16th floor of a building located across the street from the building where the crash occurred. She had a good view of the Outer Drive from her apartment and as such, on the morning of February 15, she called Wally Phillips of WGN News to offer her services for reporting traffic conditions. She left the living room for several minutes and upon returning, observed a sudden billowing fog rolling in off the lake which had completely obscured her view. She then called Wally Phillips again to inform him that she would not be able to report the traffic conditions because she could no longer see the Outer Drive. Shortly thereafter, she heard what she described as a "boom, and then * * * another boom." It appeared to be an airplane coming towards her except that it did not have

any wings. As the wind shifted, it moved to the right and landed on an adjacent lot. She then called WGN to report the accident. She also gave a written statement to the CAB investigator on that same day.

Charles L. Scott, a professional news photographer, testified that in February of 1967 he was graphics director of the Chicago Daily News and that approximately 30 to 45 minutes subsequent to the crash, he photographed the building where the initial impact of the crash occurred. The photograph appeared in the newspaper in conjunction with the article concerning the crash. It was then admitted into evidence, over plaintiff's objection, as defendant's Exhibit No. 1.

Audrey Elliott, widow of the decedent, testified that her husband began flying lessons in 1960 and that after receiving his commercial license in 1961, he began flying trips for Lake-to-Lake Dairy. At the time he left home on this last trip, he was in excellent health, with good vision and hearing. She further stated that she felt comfortable while flying with him.

The evidence depositions of Dr. Josephine Lo and Dr. Eng June Chang were read to the jury and into the record. Both physicians were interns at Edgewater Hospital at the time of plaintiff's admission in February of 1967. Their responsibilities included obtaining medical histories and conducting physical examinations of patients upon entering the hospital.

Dr. Lo testified that she obtained a medical history from plaintiff on February 16, 1967, which included an admission note stating that plaintiff's present complaint was precipitated by an accident which had frightened her and that she had experienced the same chest pain for the first time on January 27, 1967, while driving in a snowstorm. Dr. Chang also testified to having obtained a medical history from plaintiff which included a notation that plaintiff had noticed chest pains radiating to her left arm approximately two weeks prior to that time and that she had experienced an emotional shock about two days before as a result of the impact of the crash which subsequently aggravated her condition.

In response to a hypothetical question, Dr. Carl Leigh, a specialist in internal medicine and heart disease, stated that in his opinion there would be no causal connection between the aircraft accident and the development of plaintiff's heart attack and subsequent strokes. His opinion was based on the fact that to his knowledge there is no medical authority that shows any direct causal connection between emotional distress and the slower degenerative process involved in a myocardial infarction or arteriosclerosis. A second reason is based on plaintiff's past medical history of high blood pressure and chronic coronary in-sufficiency. He further stated that to his knowledge there is no medical authority that shows any connection between an emotional stress and the

development of a stroke which would result in any permanent damage, paralysis, or weakness.

## Rebuttal

Plaintiff was recalled as a witness to offer testimony concerning her activities during and after the snowstorm of January of 1967, when she had allegedly experienced similar chest pains. Plaintiff and her husband had been stranded in Indiana during the snowstorm and had spent several days in the home of local residents, Marietta and Estel Watson, along with 52 other stranded motorists. Plaintiff offered to show through the testimony of Herman Levenson and Marietta and Estel Watson that during that time she was extremely active in helping prepare and serve meals, cleaning the Watson's home, and that she showed no signs of illness. Objection by defendant to this testimony was sustained and offers of proofs were also denied by the court. Plaintiff was permitted to testify only that her activities were normal and no testimony was permitted as to her specific activities during that time.

During closing argument, defense counsel referred to defendant's Exhibit No. 1 in arguing that the extremely foggy condition was critical. The portion of the argument deemed relevant is as follows:

> "Now, this picture which was clearly taken by the newspaperman 45 minutes after, and I don't attempt to say, and don't know this was the way it was after the occurrence, but it certainly, at least, can give some idea of how bad that fog was after it arrived. The picture was taken from the adjoining building, which is only about 20 or 30 feet away, and you can hardly make out what this is, and can you imagine, can you imagine suddenly being encased in something like this and you can't see up, you can't see down, you can't see ahead, and you want to excoriate that man for doing the best he could under those circumstances?"

At the conclusion of the argument, counsel for plaintiff moved for a mistrial on the grounds that the argument was prejudicial and that it evoked sympathy for the wife and children of the decedent who were not parties to the lawsuit. However, the motion was denied. During the instructions conference, the trial court refused to give plaintiff's Instructions No. 22 and 23 over plaintiff's objections. Judgment was then entered in favor of defendant and plaintiff's post-trial motion was subsequently denied. Plaintiff appeals from the judgment entered.

## Opinion

Plaintiff initially contends that the trial court committed reversible error by failing to direct a verdict for her on the issue of negligence and by subsequently denying her post-trial motion for judgment

notwithstanding the verdict, or in the alternative, for a new trial. We disagree.

In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, our supreme court set forth the applicable standard in determining when a trial court should enter a directed verdict or judgment notwithstanding the verdict. The court stated:

> "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

Plaintiff maintains that evidence of negligence on the part of defendant's pilot, Clarence Elliott, was overwhelming. The evidence showed that Elliott was not licensed to fly using instruments and, consequently, operation of the airplane was limited to vision alone; Elliott was knowingly in violation of certain FAA regulations upon clearing the control zone at Meigs Field; his decision to take off in the face of such inclement weather amounted to recklessness. Additionally, testimony offered by such witnesses as Irving Rutz, Thomas Minoia, and expert witness, Jesse Stonecipher, also support this conclusion. Conversely, defendant argues that plaintiff did not sustain its burden as announced in *Pedrick* in light of the fact that Elliott was authorized to take-off pursuant to a special VFR clearance, in addition to the testimony of Margret Weiler regarding the sudden change in weather.

■■ Upon a review of the record, it is clear that the evidence was conflicting. Each side presented evidence which, if believed by the jury, was sufficient to sustain a verdict in its favor. Although there was evidence of negligence on the part of defendant's pilot, we hold that the trial court did not err in finding that the evidence, even when viewed in its aspect most favorable to plaintiff, does not so overwhelmingly favor plaintiff that no contrary verdict based on that evidence could ever stand.

■ Furthermore, a motion for a new trial should be granted only if the verdict is contrary to the manifest weight of the evidence. (*Smiley v. Manchester Insurance & Indemnity Co.* (1977), 49 Ill. App. 3d 675, 364 N.E.2d 683.) Such a motion is addressed to the sound discretion of the trial judge, and his judgment will not be reversed except for a clear abuse of discretion which must affirmatively appear in the record. (*Brown v. Johnson* (1978), 60 Ill. App. 3d 76, 378 N.E.2d 757.) After a review of the record and the memorandum submitted by the trial judge on this question, we cannot say that the trial judge abused his discretion in denying plaintiff's motion. It is clear that the trial judge understood his function and the proper criterion to be applied to the motion.

Accordingly, we find that the trial court's denial of plaintiff's motion for a new trial cannot be a basis for reversal by this court.

Plaintiff contends that the trial court committed reversible error by refusing to give Plaintiff's Instructions Nos. 22 and 23. We disagree. Those instructions read as follows:

"No. 22: The court has found that the defendant is liable for any injury which may have proximately resulted from the occurrence. You need only decide what injuries, if any, to plaintiff resulted from this occurrence and what amount of money will reasonably and fairly compensate the plaintiff for those injuries.

No. 23: The court has concluded as a matter of law that the defendant was negligent. The plaintiff has the burden of proving each of the following propositions:

First, that the plaintiff was injured;

Second, that the negligence of the defendant was a proximate cause of the injury to the plaintiff.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff; but, if, on the other hand, you find from your consideration of all the evidence that either of these propositions has not been proved, then your verdict should be for defendant."

■■ Instructions are proper when they convey to the jurors the correct principles of law applicable to the evidence submitted to them. (*Goodrick v. Bassick Co.* (1978), 58 Ill. App. 3d 447, 374 N.E.2d 1262.) And where not supported by the evidence, such instructions should not be given. (*McCullough v. McTavish* (1978), 62 Ill. App. 3d 1041, 379 N.E.2d 890.) Here, both instructions are addressed to the issue of defendant's negligence, which is ordinarily a question of fact for the jury. Nonetheless, in ruling adversely to plaintiff's initial contention, this court has, in effect, determined that the evidence was insufficient to support a finding that defendant's pilot was negligent as a matter of law. It follows, therefore, that instructions on this issue should not be given since there was no evidence in the record upon which to predicate them. We hold, therefore, that the trial court's refusal to give plaintiff's instructions did not constitute reversal error.

We next consider plaintiff's contention that the trial court committed reversible error by admitting into evidence a photograph of the building where the initial point of impact of the crash occurred. Plaintiff argues that a proper foundation had not been established for its admission and as such it was without probative value and highly prejudicial. We find no merit in this contention.

■■ The admissibility of photographs is a matter within the discretion of the trial court, and the exercise of that discretion is not subject to review unless an abuse of discretion to the prejudice of the complaining party is

clearly shown. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872.) A proper foundation for the admission of a photograph is established when it is shown that the photograph has some probative value and that it is an accurate portrayal of what it purports to show. *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.

The testimony of the photographer established the fact that the photograph in question portrayed what it purported to show. As was urged by defense counsel during argument at trial, the photograph was not offered to show the weather conditions existing at the time of the crash, nor was it offered to show the extent of the wreckage since it was taken approximately 30 to 45 minutes subsequent to the incident. Rather, it was offered merely to show the weather conditions existing at the time the photograph was taken, which resulted from the billowing fog that had allegedly occurred prior to the crash. Moreover, upon the admission of the photograph into evidence, the trial judge admonished the jury that it was not offered to show the weather conditions at the time of the crash.
■■ Plaintiff also objects to the admission of the photograph in alleging that the trial judge did not know the purpose for which it was offered. However, plaintiff is incorrect in arguing this point as evidenced by a portion of the memorandum where the trial judge stated:

> "In both written and oral argument, reference was made to the Court admitting the newspaper photo into evidence after saying that it did not know why it was being offered. The Court did make such a remark when it was initially offered, but then argument continued for about six transcribed pages during which time it was pointed out, among other things, that plaintiff had already put in evidence of weather conditions up to eight minutes after the accident. After this extended argument, the Court simply stated, 'I would allow its admission.' The Court's original curiosity as to why it was being offered was obviously satisfied by this extended argument."

Based on the foregoing, it cannot be concluded that the trial court abused its discretion in admitting the photograph or that a proper foundation was not established for its admission.

Plaintiff's next allegation is that the use of the photograph in question by defense counsel during closing argument was improper, prejudicial and deprived plaintiff of a fair trial. We disagree.

In arguing a case to the jury, counsel is permitted broad latitude to draw reasonable inferences and conclusions from the evidence. (*Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34.) The scope of permissible argument is within the sound discretion of the trial court. (*Saputo*). Furthermore, the use of exhibits by counsel to illustrate his closing argument is proper so long as the exhibits are not misleading to the

jury. *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.

■■ In the instant case, defense counsel utilized the photograph depicting the initial point of impact of the crash during his closing argument. The photograph had been properly admitted by the trial court and the court admonished the jury with respect to the limited purpose of its admission. Upon a review of counsel's comments in the record, we do not find that the trial court permitted unreasonable latitude in this regard. Nor do we find that the jury was misled since counsel also remarked about the limited purpose of the photograph during the argument. Thus, we hold that the use of the photograph in this manner was proper and did not prevent plaintiff from receiving a fair trial.

■■ Plaintiff also contends that the trial court committed reversible error by overruling her objections to defendant's cross-examination of Dr. Alfred Rosenblum regarding a medical history taken by another doctor. Included in the medical report was a conversation between plaintiff and Dr. Chang regarding plaintiff's prior chest pains, which she argues is hearsay, to which Dr. Rosenblum cannot testify. In response, defendant argues that his intention was to merely question Dr. Rosenblum as to the significance of the information contained in the report. Defendant further argues that since the information was part of a hospital record made in the regular course of hospital business, it is not hearsay and therefore admissible. We agree.

In support of our position, we rely upon the recent decision in *Clemons v. Alton & Southern R.R. Co.* (1977), 56 Ill. App. 3d 328, 370 N.E.2d 679, where plaintiff made an assertion similar to the one advanced here. There, the court held as admissible, as an exception to the hearsay rule, the testimony of a doctor which included a consultation note concerning plaintiff that had been prepared by a psychiatrist. The court cited as controlling the decision in *Smith v. Williams* (1975), 34 Ill. App. 3d 677, 339 N.E.2d 10, where an identical situation was confronted. Although *Clemons* and the case at bar differ in that *Clemons* involved an evidence deposition which was read to the jury and this case involves oral testimony, we see no reason to view such a distinction as significant. Therefore, consonant with the holdings in *Clemons* and *Smith*, we find that Dr. Rosenblum's testimony was admissible as an exception to the hearsay rule and as such the trial court did not err in overruling plaintiff's objections.

Plaintiff's final contention is that the trial court committed reversible error by sustaining the objections to her proffer of rebuttal testimony and by denying the offers of proof regarding her activities during and after the snowstorm of January of 1967. Defendant argues, and correctly so, that

the evidence was not proper rebuttal as it was repetitious and cumulative of evidence previously presented during plaintiff's case in chief.

Rebuttal evidence is that which explains, repels, contradicts, or disproves evidence introduced by the defendant during his case in chief. (*Rodriguez v. City of Chicago* (1974), 21 Ill. App. 3d 623, 316 N.E.2d 88.) The allowance of rebuttal evidence lies within the discretion of the trial court, and such rulings will not be set aside on review unless an abuse of that discretion is shown. *People v. Thornton* (1977), 54 Ill. App. 3d 202, 369 N.E.2d 358.

On direct examination, plaintiff denied ever having experienced chest pains prior to the incident. The evidence depositions of Drs. Lo and Chang presented by defendant in his case in chief indicated that plaintiff had previously experienced similar chest pains. In rebuttal, plaintiff then sought to admit the testimony of various witnesses to show that she was extremely active and in good health during and after the snowstorm. However, defendant's objection to this testimony was sustained and offers of proof were, likewise, denied by the trial court. Plaintiff was then allowed to testify that her activities were normal and no testimony was allowed as to her specific activity during that time.

■■ In support of her argument, plaintiff cites *Pellico v. E. L. Ramm Co.* (1966), 68 Ill. App. 2d 322, 216 N.E.2d 258, and *Loftus v. Loftus* (1907), 134 Ill. App. 360, for the proposition that:

"* * * where a defendant introduces evidence of an affirmative matter in defense or justification, the plaintiff, as a matter of right, is entitled to introduce evidence in rebuttal as to such affirmative matter." *Loftus*, 134 Ill. App. 360, 362.

■■ While we are in agreement with this proposition, we cannot say that it is applicable to the facts presented herein. The evidence proffered by plaintiff did not tend to explain, repel, contradict, or disprove any evidence introduced by defendant. On the contrary, the facts indicate that the issue of prior chest pains was initially raised by plaintiff during her case in chief. We concur with the trial court in holding that this evidence was not proper rebuttal and to allow its admission would have given rise to collateral issues not germane to the case. Consequently, we find that the trial court did not abuse its discretion in this regard.

Accordingly, we affirm the judgment of the trial court.

LORENZ and MEJDA, JJ., concur.