GERALD HAZELWOOD, Plaintiff-Appellee, *v.* ILLINOIS CENTRAL GULF RAILROAD, Defendant-Appellant.—(Hudson Township, Defendant.)

Fourth District   No. 4—82—0424

Opinion filed May 4, 1983.

704

Roger D. Lapan and John N. Stevens, both of Bloomington, for appellant.

G. Michael Prall, of Yoder, Yoder, Zanoni, Flynn, Prall & Willard, of Bloomington, for appellee.

JUSTICE MILLS delivered the opinion of the court:
Railroad crossing—motorcycle accident—wilful and wanton allegation.
Jury verdict for plaintiff.

$30,000 compensatory, $170,000 punitive.
We affirm.

## THE FACTS

On a warm spring evening, Gerald Hazelwood was returning, on his motorcycle, from an outing in the Lake Bloomington area. Accompanied by a friend on another motorcycle, Hazelwood was traveling toward Bloomington on Comlara Park Road. It was dark and the weather was clear. Both riders were using their headlights. Riding ahead of his friend, Hazelwood suddenly saw a set of cross-bucks marking a railroad crossing. Quickly he glanced both ways for a train and then looked ahead and saw a deep depression in the road at the crossing. He barely had time to touch his brakes before he hit the depression and flew into the air. When he landed, he suffered severe facial injuries.

Hazelwood brought suit against the Illinois Central Gulf Railroad and Hudson Township, where the crossing is located. He alleged that the railroad had negligently and wilfully and wantonly failed to maintain the crossing in a safe condition. At trial, he produced evidence to establish that the grade crossing where he was injured was located on a heavily traveled road; that the crossing was in an unsafe condition; and that the crossing had been in that condition for several years. Hazelwood also introduced evidence to show that the railroad knew of the condition of the crossing.

After hearing the evidence, the jury awarded Hazelwood $30,000 in compensatory damages and $170,000 in punitive damages against the railroad. The jury did not award any damages against Hudson Township. The trial court entered judgment on the jury's verdict and the railroad appeals.

## THE EXPERT TESTIMONY

First, the railroad argues that it was error for the trial court to admit a drawing of the crossing made by Hazelwood's engineering expert. The railroad maintains that the admission of the drawing was cumulative and prejudicial because there were already pictures in evidence that clearly depicted the crossing.

■ The admissibility of evidence, such as photographs and drawings, is within the discretion of the trial court. The court's exercise of that discretion will not be overturned unless there has been a clear abuse of that discretion. (*Levenson v. Lake-to-Lake Dairy Cooperative* (1979), 76 Ill. App. 3d 526, 394 N.E.2d 1359.) Also, and more specifically, the introduction of cumulative evidence is largely a matter

within the discretion of the trial court. (*Ross v. Pfeifer* (1976), 39 Ill. App. 3d 789, 350 N.E.2d 797.) There is nothing in the record which indicates to us that the trial court abused its discretion by admitting the drawing into evidence.

Furthermore, even if the trial court had erred by admitting the drawing, the railroad waived that error by failing to make the specific objections it now raises when the drawing was offered into evidence (*DeMarco v. McGill* (1948), 402 Ill. 46, 83 N.E.2d 313) and by failing to include those objections in its post-trial motion. *Graves v. North Shore Gas Co.* (1981), 98 Ill. App. 3d 964, 424 N.E.2d 1279.

■ Next, the railroad argues that it was error for the trial court to allow Hazelwood's engineering expert to testify about the condition of the railroad ties and spikes in an area 100 feet on either side of the crossing. The expert testified that the poor condition of the rails on both sides of the crossing had a direct effect on the poor condition of the crossing itself. Because the condition of the rails on either side of the crossing was a relevant fact, it was properly admitted to support the expert's opinion that the crossing was hazardous. *Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768.

■ The railroad also argues that it was error to allow the engineering expert to testify on redirect as to whether the crossing met Illinois Commerce Commission (ICC) standards. The railroad itself raised the issue of compliance with the ICC standards. During its cross-examination of the expert, the railroad asked specifically whether the expert had investigated the crossing in order to determine whether it violated the applicable ICC regulations. The railroad cannot complain on appeal about the expert's testimony when the railroad itself began that line of questioning during its cross-examination of the expert. *Johnson v. Ward* (1972), 6 Ill. App. 3d 1015, 286 N.E.2d 637; *Smith v. Illinois Valley Ice Cream Co.* (1959), 20 Ill. App. 2d 312, 156 N.E.2d 361.

■ At the trial, Hazelwood's doctor testified as to the extent of Hazelwood's injuries. The railroad contends that the doctor should not have been allowed to base his opinion on records which he did not prepare. Our supreme court in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, answered this issue when it ruled that an expert may base his opinion on data that he did not compile.

## THE DISCOVERY ORDER

The railroad maintains that it was error for the trial court to refuse to allow one of the railroad's witnesses to testify. We agree. It was error. However, it was harmless error.

The railroad was ordered by the trial court to disclose, by April 9, 1982, the names of all experts and other witnesses which it had not previously disclosed. The railroad did not disclose any additional witnesses between the date of the order and April 9, The railroad then called a previously undisclosed witness, Don Richardson, the State coordinator of the safety program for the Illinois Commerce Commission. Hazelwood objected, alleging that the railroad had violated the discovery order. The trial court sustained the objection and excluded Richardson from testifying.

■ The trial court erred. The railroad did not violate the discovery order. The order required the railroad to furnish, by April 9, the names of the witnesses it intended to call. The railroad stated twice during the trial that it did not know Richardson would be a witness by April 9. Hazelwood did not present and the record does not contain any evidence to the contrary. Therefore, the witness should not have been excluded. *Clay v. McCarthy* (1979), 73 Ill. App. 3d 462, 392 N.E.2d 693.

■ The trial court's error, however, was harmless. After the witness was excluded, the railroad made an offer of proof stating that the witness would have testified that the ICC's files did not contain any complaints about the crossing and thus the railroad was not placed on notice about the dangerous nature of the crossing. During the trial, however, other witnesses for the railroad testified that the railroad did not have any knowledge concerning prior complaints about the crossing. The excluded witness' testimony would have been merely cumulative and thus it was harmless error to exclude him. *Kupcikevicius v. Fitzgibbons* (1976), 41 Ill. App. 3d 405, 354 N.E.2d 434; *Wanner v. Keenan* (1974), 22 Ill. App. 3d 930, 317 N.E.2d 114.

### THE AMENDMENT TO THE COMPLAINT

The railroad argues that the trial court erred by allowing Hazelwood to amend his complaint after the close of evidence.

We disagree.

Section 2—616 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—616) authorizes a trial court to allow amendments to pleadings at any time before final judgment. This section gives the trial court broad discretion in allowing amendments and the court's ruling will not be disturbed unless there has been a manifest abuse of that discretion. *Mundt v. Ragnar Benson, Inc.* (1975), 61 Ill. 2d 151, 335 N.E.2d 10.

■ Originally, Hazelwood's complaint alleged that the railroad violated Rule 203 of ICC general order 138. The trial court allowed him

to amend his complaint to instead allege a violation by the railro
section 58 of the Public Utilities Act. (Ill. Rev. Stat. 1981, ch. 1
par. 62.) In his complaint, Hazelwood based his allegations of the
road's negligent and wilful and wanton conduct on the railroad's
ure to meet certain standards of conduct. One of those standard
the requirement that grade crossings be maintained so as to ins
that the surface of the highway is flush with the rails. That requi
ment is contained in both section 58 and Rule 203. Therefore, t
amendment only changed the source of the standard. Because Haz
wood was not changing the theory of his case by making the amen
ment, the amendment did not unfairly prejudice the railroad and th
trial court did not abuse its discretion by allowing the amendment.
*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill.
2d 326, 211 N.E.2d 253.

### THE VERDICT FORM

■ The railroad contends that the jury did not receive a proper verdict form. The railroad argues that because this suit involved comparative negligence and multiple parties, the jury should have received a verdict form which required them to state: the total amount of damages suffered by Hazelwood; the percentage of negligence attributable to Hazelwood; and the percentage of negligence attributable to each defendant. Such computational comparative negligence forms—tendered by both the railroad and Hudson Township—were refused by the trial court. Instead, the court gave the jury Illinois Pattern Jury Instruction (IPI), Civil, No. A45.05 (2d ed. 1981 Supp.), outlining how to reduce Hazelwood's damages due to any negligence on his part and a modified IPI general verdict form (IPI Civil No. A45.09 (2d ed. 1981 Supp.)). We find that the combination of the instruction and the general verdict form was adequate to allow the jury to reach a verdict and that the trial court did not err by refusing to give the computational verdict form. Furthermore, it is clear from the record and counsel admitted during oral arguments that the railroad objected neither when Hazelwood tendered the general verdict form nor when the court refused to give the computational verdict form.

### THE MANIFEST WEIGHT OF THE EVIDENCE

Next, the railroad argues that the jury's verdict was against the manifest weight of the evidence because the evidence clearly showed that Hazelwood's conduct was the sole proximate cause of the accident. Once again we are forced to disagree.

■ A reviewing court will only reverse a jury's finding when, in

of all the facts in evidence, that verdict is unreasonable. (*Lynch* *board of Education* (1980), 82 Ill. 2d 415, 412 N.E.2d 447.) There [is] substantial evidence in the record before us that the railroad allowed the crossing to fall into a state of disrepair and that the dangerous condition of the crossing contributed to Hazelwood's accident and resulting injuries. Therefore, the jury could have reasonably concluded that Hazelwood's conduct was not the sole cause of the accident and that the railroad was at fault.

### THE PUNITIVE DAMAGES AWARD

We have left the most intriguing issue until last. The railroad maintains that it was error for the trial court to enter judgment on the jury's punitive-damages award because there is no basis in the law for the award and because the award is excessive. We disagree on both points.

The issue of whether the defendant's conduct justifies the imposition of punitive damages is a question of law. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) Punitive damages are penal in nature and are not favored by the courts. (*Cornell v. Langland* (1982), 109 Ill. App. 3d 472, 440 N.E.2d 985.) They should only be allowed where the defendant has acted wilfully or with such extreme negligence as to indicate a reckless disregard for the safety of others. (*Kelsay*.) Such a conscious disregard for the safety of others may be termed wilful and wanton and gives rise to the imposition of punitive damages. *Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481, 211 N.E.2d 720.

This court, in *Harvey v. Norfolk & Western Ry. Co.* (1979), 73 Ill. App. 3d 74, 390 N.E.2d 1384, stated that punitive damages are proper in an action arising out of a crossing accident where: (1) a statute or ICC rule requires a certain standard; (2) the railroad has violated that standard; (3) the violation is of a longstanding nature; (4) the railroad is aware of the violation; (5) the railroad has failed to conduct proper maintenance to correct the violation; and (6) the railroad has failed to continue to inspect to determine whether the violation still exists. We said in *Harvey* that where the above factors are present, a jury could reasonably conclude that the railroad was acting with utter disregard for the danger which the violation presented to the public and therefore the railroad's action could be termed wilful and wanton and give rise to punitive damages.

In the case at bench, Hazelwood demonstrated to the jury that there were statutory and ICC standards which the railroad violated by allowing the crossing to fall into a state of disrepair. He also

presented evidence to show that the violation was of a longstanding nature. Several witnesses testified that the crossing had been in a state of disrepair for at least 10 years. Evidence was also produced to show that the railroad was aware of the condition of the crossing. The railroad's track supervisor testified that he had traveled across the crossing at least once a week for the last 10 years. And the fact that the condition at the crossing existed is itself sufficient evidence that the railroad failed to conduct proper maintenance to correct the violation. There is, however, no evidence that the railroad failed to inspect the crossing. Instead, there is evidence in the record that the railroad inspected the crossing frequently. It is far more egregious for the railroad to continue to inspect the crossing and then fail to repair it than for the railroad to simply fail to inspect. Consequently, it is clear from the record before us that, as a matter of law, the railroad's actions justified the imposition of punitive damages.

The amount of punitive damages awarded a plaintiff is a matter for the discretion of the jury. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 419 N.E.2d 578.) And a reviewing court will only reduce the amount of the award when it is clearly excessive. (*Kelsay.*) There are, however, no clear guidelines in Illinois for determining when a punitive damages award is *excessive*. We know that the amount does not have to be proportional to the amount of compensatory damages. (*Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 427 N.E.2d 608.) We also know that the plaintiff's attorney fees may be included in the amount of the award. (*Anvil Investment Limited Partnership v. Thornhill Condominiums, Ltd.* (1980), 85 Ill. App. 3d 1108, 407 N.E.2d 645.) Beyond those principles, however, there are no standards in Illinois by which we can judge whether the award is excessive. See *Stambaugh v. International Harvester Co.* (1982), 106 Ill. App. 3d 1, 26, 435 N.E.2d 729 (Welch, J., dissenting in part).

It would be both impossible and unwise for us to attempt to draw a line with mathematical precision separating proper awards from excessive awards. Instead, we set forth three factors which courts should consider in determining whether an award is excessive. Before we list those factors, however, it is first necessary to discuss the purposes behind the granting of punitive-damages awards. For an award becomes excessive only when it is so large that it no longer serves those purposes.

The doctrine of punitive damages first appeared in England in the 18th century when the practices of charging juries on the measure of damages became part of the common law practice. (Morris, *Punitive*

*Damages in Tort Cases,* 44 Harv. L. Rev. 1173, 1176 (1931).) The doctrine was originally used by the English courts as a means of justifying awards of damages in excess of the tangible harm suffered by the plaintiff. (*Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509.) In the 1760's, punitive damages began to take on a dual nature: first, as compensation for intangible wrongs such as mental distress and suffering, and secondly, as punishment for the defendant. Note, *Exemplary Damages in the Law of Torts,* 70 Harv. L. Rev. 517 (1957).

When the doctrine crossed the Atlantic, its dual nature was recognized by the American courts. In 1845, our supreme court in *McNamara v. King* (1845), 7 Ill. (2 Gilm.) 432, 436, stated that the function of punitive damages is "not only to compensate the plaintiff, but to punish the defendant." See also *Holsey v. Brooks* (1958), 20 Ill. 116; *Ously v. Hardin* (1860), 23 Ill. 352; *Foote v. Nichols* (1862), 28 Ill. 486.

Then as the courts began to recognize the award of actual damages for intangible harms, the compensatory nature of the doctrine fell into disuse. The courts began to focus instead on the punitive nature of the doctrine. (See *Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 148, 383 N.E.2d 929 (Ryan, J., dissenting).) This change in focus was first reflected in Illinois in *Hawk v. Ridgway* (1864), 33 Ill. 473, 476, where our supreme court ruled that "[w]here the wrong is wanton, or it is willful, the jury are authorized to give an amount of damages beyond the actual injury sustained, as a punishment, and to preserve the public tranquility." See also *Meidel v. Anthis* (1874), 71 Ill. 241.

Today, the nature of punitive damages in Illinois is clearly singular—it is *punishment* for the defendant. (*Kelsay.*) That punishment is designed in turn to promote three purposes: (1) to act as retribution against the defendant; (2) to deter the defendant from committing similar wrongs in the future; and (3) to deter others from similar conduct. (*Kelsay; Mattyasovszky.*) With the nature and purposes of punitive damages in mind, we now turn to the ·factors which a court should consider in determining whether a punitive-damages award is excessive.

■■ The *first factor* is the nature and enormity of the wrong. While all acts which give rise to punitive damages are wilful and wanton, some of those acts are clearly more reprehensible than others. The egregiousness of the act should be reflected in the amount of the award. Courts in several jurisdictions—both Federal and State—have considered this factor when determining the excessiveness of an

award. (See *Silkwood v. Kerr-McGee Corp.* (W.D. Okla. 1979), 485 F. Supp. 566, *rev'd on other grounds* (10th Cir. 1981), 667 F.2d 908; *Mailloux v. Bradley* (Colo. App. 1982), 643 P.2d 797; *Black v. Gardner* (S.D. 1982), 320 N.W.2d 153; *Grimshaw v. Ford Motor Co.* (1981), 119 Cal. App. 3d 757, 174 Cal. Rptr. 348; *Binyon v. Nesseth* (1981), 7 Kan. App. 2d 110, 638 P.2d 946, *aff'd* (1982), 231 Kan. 381, 646 P.2d 1043; *Beerman v. Toro Manufacturing Corp.* (1980), 1 Hawaii 111, 615 P.2d 749.) Recognizing that punitive damages are in the nature of a criminal sanction, we are simply saying that the punishment should fit the crime. An award which is disproportionate to the wrong serves none of the purposes of punitive damages and is excessive.

The *second factor* is the financial status of the defendant. Although an award so small that it would be only an ordinary item of expense does not serve the purposes of retribution and deterrence, an award which bankrupts the defendant is excessive. Punitive damages should be large enough to provide retribution and deterrence but should not be so large that the award destroys the defendant. Thus, before a court can gauge the award, it must first gauge the financial position of the wrongdoer. (See *In re Northern District of California "Dalkon Shield" IUD Products Liability Litigation* (N.D. Cal. 1981), 526 F. Supp. 887; *Arab Termite & Pest Control of Florida, Inc. v. Jenkins* (Fla. 1982), 409 So. 2d 1039; *Wangen v. Ford Motor Co.* (1980), 97 Wis. 2d 260, 294 N.W.2d 437.) The court in *Chilvers v. New York Magazine Co.* (App. Div. 1982), 114 Misc. 2d 996, 997, 453 N.Y.S.2d 153, 154, noted the importance of the defendant's financial status when it wrote:

> "Would we deter the commission of malicious acts by the wealthy if they were punished the same as the poor? Although the sanctions of the criminal law obviously do not consider the wealth of the offender, if wealth were not considered when dealing with the imposition of civil exemplary damages, the reason for the imposition of the award would be subverted."

Simply stated, the amount of the award should send a message loud enough to be heard but not so loud as to deafen the listener. A deafening award is excessive.

The *third factor* which should be considered is the potential liability of the defendant. This factor was noted in comment *e* of section 908 of the Restatement (Second) of Torts:

> "Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. It seems appropriate to

take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future." (Restatement (Second) of Torts sec. 908, comment e, at 467 (1977).)

As Judge Friendly stated in *Roginsky v. Richardson-Merrell, Inc.* (2d Cir. 1967), 378 F.2d 832, 839:

"The legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering. *** We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill."

Although this factor has particular application in products liability situations, it should be considered in any case where the defendant faces multiple liability for the same or similar wrongs. Without this factor in our "excessiveness equation," the result may well be a stampede to the courthouse, with the swiftest taking home large awards, the slow returning with nothing but their injuries, and the defendant being trampled into bankruptcy. Such a situation would be intolerable.

■■■ Applying the three factors we have here outlined, we find that the $170,000 award in the case at bar is not excessive. First, the award does not outweigh the wrong. The jury found that Hazelwood was injured by the railroad's failure to repair a dangerous crossing. The injury was serious and the magnitude of the wrong which caused it is fairly reflected in the amount of the award. Next, the amount of the award does not threaten the financial stability of the railroad. The award represents .0237% of the railroad's net worth which is $716,180,000. In view of all the attendant circumstances, we cannot say this is excessive. Finally, the potential liability of the railroad for the same or similar wrongs is not great enough to make this award excessive. The railroad's potential liability for the same wrong—its failure to maintain this particular crossing in a safe condition—is almost nil. Hazelwood was the only person injured in the accident which gave rise to this suit and future accidents at the same crossing may easily be prevented by prompt repair. The railroad's greatest potential for liability is from similar wrongs—failure to maintain other crossings in a safe condition. The railroad operates approximately 45,000 miles of track and 2,946 crossings in Illinois. A multimillion-dollar punitive-damage award against the railroad in every crossing accident suit may be excessive. The amount of the present award, however, would not result in overkill. For these reasons we find that the award is not excessive.

In conclusion, because we have found that the trial court erred

only once and that that error was harmless, and because we have found that the punitive-damages award is not excessive, the judgment below is affirmed.

Affirmed.

GREEN and MILLER, JJ., concur.