**MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs,**

v.

**Kemal UZAN, Cem Cengiz Uzan, Murat Hakan Uzan, Melahat Uzan, Aysegul Akay, Antonio Luna Betancourt, Unikom Iletism Hizmetleri Pazarlama A.S., Standart Pazarlama A.S., and Standart Telekomunikasyon Bilgisayar Hizmetleri A.S., Defendants.**

No. 02 Civ. 0666(JSR).

United States District Court, S.D. New York.

Feb. 8, 2006.

---

10. *See* note 2, *supra.*

Gordon M. Clay, Howard H. Stahl, John F. O'Connor, Steven K. Davidson, Steptoe & Johnson, L.L.P., Washington, DC, Mishell B. Kneeland, Paul J. Fishman, Friedman, Kaplan, Seiler & Adelman, L.L.P., Jason Brown, Michael N. Donofrio, Neal N. Beaton, Holland & Knight LLP, New York City, for Plaintiffs.

Kenneth M. Bialo, Emmet, Marvin and Martin, L.L.P., Mark Benjamin Holton, Robert F. Serio, Thomas C. Sheehan, Gibson, Dunn & Crutcher LLP, Dan J. Schulman, Salans, New York City, Ryan E. Bull, Baker Botts LLP, Washington, DC, for Defendants.

### OPINION AND ORDER

RAKOFF, District Judge.

Familiarity with the Court's factual findings in this case, as set forth in the Court's prior reported decision, *Motorola Credit Corp. v. Uzan*, 274 F.Supp.2d 481 (S.D.N.Y.2003) ("*Uzan I*"), and affirmed by the Court of Appeals, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir.2004) ("*Uzan II*"), is here presumed. Those factual findings detail at great length a multi-billion-dollar fraud perpetrated by the individual defendants (five members of the Uzan family and one of their closest associates), in connivance with various corporate defendants that were then controlled by the individual defendants.[1]

In *Uzan I*, the Court awarded plaintiff Motorola Credit Corporation ("Motorola")

---

1. Subsequent to the Court's decision, several of the individual defendants were indicted by the Turkish Government for their participation in a separate multi-billion-dollar fraud, and certain of their assets, including those of the corporate defendants, were seized. *See* Press Release, Office of the Prime Minister of Turkey, Police Seek Five Uzan Family Members in Imar Bank Corruption Case (Aug. 18, 2003), http://www.byegm.gov.tr/ YAYINLARIMIZ/CHR/ING 2003/08/03x08x18. HTM# 5; *Turkish Plan to Sell Seized Telsim May Snag on Mobile Firm's Debts*, Wall Street J. Europe, Apr. 16, 2004 ("Patriarch Kemal Uzan and Hakan are being tried in absentia by an Istanbul court on charges of fraud at Imar Bank. The Turkish government has issued in-

$2,132,896,905.66 in compensatory damages, and an equal sum in punitive damages. *See Uzan I* at 580. The Court of Appeals affirmed the compensatory damages, *see Uzan II*, at 59, but, while noting that "on this record, some punitive damages award is appropriate," *id.* at 63, remanded for reconsideration of the size of the punitive award.[2] Following briefing and oral argument by the parties, *see* transcript, 8/18/05, the Court now determines what amount of punitive damages must be awarded Motorola from the individual defendants pursuant to the applicable laws of Illinois and the United States.

As the Court's prior findings evidence, at length, the individual defendants, jointly and severally, engaged in a coordinated campaign of lies and misrepresentations in order to swindle Motorola of more than $2 billion, which they then converted to their own joint and several benefits. When threatened with exposure, they resorted not only to further lies and corporate manipulations but even to obstruction of justice and, ultimately, misrepresentations to this Court. They also engaged in knowing contempt of this Court's orders and criminal contempt of the parallel orders of a British court.

It is obvious, therefore, that defendants' conduct was fraudulent, willful, and malicious, evincing a wanton and deliberate disregard for Motorola's rights, and well warranting punitive damages under Illinois law. *See, e.g., Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 186, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978) ("It has long been established in this State that punitive or exemplary damages may be awarded when torts are com-

---

ternational warrants for their arrest."); *Imar Bank Case Suspects Go To Court For the First Time,* Turkish Daily News, Oct. 14, 2003 ("In the indictment it is reported that the suspects knew that the bank was in bad shape but despite this hid and destroyed bank records to prevent anyone from finding out they illegally embezzled funds.... Kemal Uzan, Yavuz Uzan and Hakan Uzan are among 22 suspects."); *Turkey's Imar Bankasi Violated Banking Law,* Dow Jones Int'l Newswire, Aug. 19, 2003. Thereafter, a settlement was reached between Motorola and the Turkish governmental representatives, *see Motorola to recoup $500 million over Telsim,* Chi. Trib., Oct. 29, 2005; *Motorola gets $500 million cash in Telsim settlement,* Assoc. Press, Oct. 28, 2005, that, once effectuated, will moot all remaining issues concerning the corporate defendants, *Business Brief–Motorola Inc.: Settlement Is Reached in Suit Against Turkish Wireless Firm,* Wall Street J., Oct. 29, 2005.

2. With respect to co-plaintiff Nokia Corporation, this Court, having found that the individual defendants wrongfully converted to their benefit and control most of the value of Nokia's promised collateral of approximately 7.5% of Telsim's outstanding shares, awarded Nokia a constructive trust over 7.5% of the shares of Telsim in its July 31, 2003 Order (in addition to awarding Motorola a constructive trust over 66% of the shares of Telsim). *Uzan I* at 581. Furthermore, since the individual defendants had already been found in contempt of the Court's prior orders regarding the transfer of stock, the Court entered a self-executing contempt sanction, whereby judgment would be automatically entered for $1,707,415,278.26, double the amount outstanding on the loans extended by Nokia to Telsim, should defendants fail to comply with the order. *Uzan I* at 582.

The Individual Defendants filed their notice of appeal from the July 31 Order and August 1 judgment on August 13, 2003. In the course of prosecuting that appeal, they failed to raise any arguments challenging the self-executing contempt sanction. When they filed a second appeal challenging the self-executing contempt sanction, they argued that the issue was not ripe at the time of the first appeal since the Clerk of this Court had not yet issued a judgment of contempt when the individual defendants filed their notice of appeal from the July 31 Order and August 1 judgment. The Court of Appeals held that defendants had waived their right to appeal, since, notwithstanding the absence of a judgment of contempt, the sanction had already matured into a final order at that time. *See Nokia Corp. v. Uzan,* 425 F.3d 1005 (2d Cir. 2005).

mitted with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."); *Laughlin v. Hopkinson*, 292 Ill. 80, 89, 126 N.E. 591 (1920) ("Where damages result from willful, wanton and grossly fraudulent representations, we think it proper that the jury should be permitted to inflict damages for example's sake and by way of punishment to the defendant.").

In determining the size of the punitive award under Illinois law, the Court should consider "the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant." *Deal v. Byford*, 127 Ill.2d 192, 204, 130 Ill.Dec. 200, 537 N.E.2d 267 (1989). As to the first prong, it is beyond question that the defendants' fraud was enormous, both in amount and in the defendants' brazen resort to all kinds of reprehensible misconduct to achieve their ends. Since, with respect to punitive damages, "the punishment should fit the crime," *Hazelwood v. Illinois C.G. Railroad*, 114 Ill.App.3d 703, 713, 71 Ill.Dec. 320, 450 N.E.2d 1199 (1983), defendants' misconduct warrants a very sizeable financial penalty to punish and deter them. *See Kelsay*, 74 Ill.2d at 186, 23 Ill.Dec. 559, 384 N.E.2d 353.

As to the second prong, "punitive damages should be large enough to provide retribution and deterrence but should not be so large that the award destroys the defendant." *See Hazelwood*, 71 Ill. Dec. 320, 450 N.E.2d at 1207. Here, the individual defendants, despite repeated discovery orders, have refused to produce evidence of their financial situation—evidence largely or exclusively in their control. This does not mean that the Court is free to award any amount of punitive damages it feels like, *see Uzan II*, at 64, but it

does mean that Motorola is not required, and, indeed, could not reasonably be expected, to submit "hard" evidence of defendants' financial position. *See Deal*, 127 Ill.2d at 205, 130 Ill.Dec. 200, 537 N.E.2d 267 ("The plaintiff was not required to present such evidence [regarding their financial status], and the defendants made no attempt to do so. The defendants cannot now complain of its absence."); *Ford v. Herman*, 316 Ill.App.3d 726, 734, 249 Ill. Dec. 942, 737 N.E.2d 332 (2000) ("If a defendant facing a punitive damages claim realizes that the plaintiffs are not presenting what would clearly be relevant financial status evidence, the defendant bears the burden of putting on that evidence."); *Pickering v. Owens–Corning Fiberglas Corp.*, 265 Ill.App.3d 806, 823, 203 Ill.Dec. 1, 638 N.E.2d 1127 (1994) (finding no abuse of discretion when "[t]he trial court ordered [in response to defendant's failure to fully respond to discovery requests for financial information in connection with their punitive damages claim] that plaintiffs' amended allegations that defendant's net worth was $ 1.5 billion would be deemed admitted and that defendant would not be allowed to contest this value.").

In 2003, Forbes estimated the Uzan defendants' net worth at $1.3 billion. *Forbes World's Richest People*, Forbes, Mar. 2003. In 2004, it estimated that their net worth had increased to $1.5 billion. *Forbes Billionaires List*, Assoc. Press, Feb. 27, 2004. These, obviously, are rough estimates at best, but were made by a disinterested third party. However, they were almost certainly under-estimates because they did not take account of the evidence that subsequently came to light of the defendants' huge embezzlements.

Specifically, this Court determined in *Uzan I* that the individual defendants had converted to their own use a substantial

part of the $2 billion stolen from Motorola. *Uzan I* at 558–61. Thereafter, the Turkish government charged certain of the Uzans with embezzling more than $5 billion in connection with an entirely separate $6 billion bank fraud. *See, e.g., Uzan says he sought deals; Motorola lawyer dismisses offers*, Chi. Trib., Mar. 2, 2004 ("Uzan's father, Kemal, and his brother, Hasan, have been fugitives since the Turkish government last summer accused them of pilfering the $5.8 billion from Imar Bank."); *Turkish Regulator Rejects Uzan's Debt Repayment Plan*, Dow Jones Int'l News, Mar. 12, 2004 ("An investigation found that some $6 billion in Turkish lira and foreign currency had been deposited at the bank without any record and was used by the controlling shareholders. The government started repaying depositors in January, labelling the Imar case as 'the biggest bank robbery in history.' "); *Turkey Seizes 219 Companies Of Uzan Family*, N.Y. Times, Feb. 16, 2004 ("Turkey has accused leading members of the family, including the patriarch Kemal Uzan, of involvement in a multibillion-dollar bank fraud."); *Motorola, Turkey Chase Family for Missing Billions*, Chi. Trib., Dec. 28, 2003 ("The Turkish government believes the Uzans siphoned $5.2 billion from a bank they owned, Imar Bankasi."); *WEEK*, Turkish Probe, Dec. 14, 2003 ("Foreign Minister Abdullah Gul says Turkey has asked the United States to extradite members of the controversial Uzan family, accused in Turkey of involvement in a multi-billion dollar fraud in the collapsed Imar Bank."). Although, in this connection, the Turkish Government has seized certain of the defendants' assets in Turkey—notably the telecommunications company Telsim—the secretive and labyrinthine manner in which the individual defendants operated their complex financial empire, *see Uzan I* at 526–537, makes it likely that they retain access to substan-

tial assets even while some of them are occupying fugitive status. *See, e.g., Press Scanner*, Turkish Daily News, Jan. 17, 2006 (summarizing reports that the Uzans are currently 'living like kings' in Jordan, where a Vatan reporter says he has uncovered evidence of six new companies formed by the Uzan family.).

All of this suggests that the individual defendants, jointly and severally, remain billionaires and should be able to satisfy a very substantial punitive damages award. Given the reprehensibility of the individual defendants' concerted conduct, the size of their fraud, and their seeming ability to pay, and taking account the goals of punishment and deterrence, the Court finds that an award of $1 billion in punitive damages is necessary and permissible under Illinois law. Because the concerted manner in which the individual defendants carried out the original fraud, as well as their ties of blood or (in the case of Mr. Betancourt) long-term close association, strongly suggests that they maintain joint and several access to their assets, liability for such damages should be joint and several.

This penalty is well within accepted bounds under applicable Illinois law. Based on the data set forth above, the individual defendants' collective net worth remains at least $5 billion, so that the award is 20% of their net worth, considerably less than Illinois courts have approved. *See, e.g., Motsch v. Pine Roofing Co.*, 178 Ill.App.3d 169, 127 Ill.Dec. 383, 533 N.E.2d 1 (1989) (37% of net worth); *National Bank v. Doss*, 141 Ill.App.3d 1065, 1074, 96 Ill.Dec. 292, 491 N.E.2d 106 (1986) (71% of net worth); *cf. In re New Orleans Train Car Leakage Fire Litig.*, 795 So.2d 364, 388 (La.Ct.App.2001) ("The $850 million punitive damages award is about 18% of CSX's net worth. We do not find that percentage to be an abuse of

discretion in this case because we cannot say that 18% is indisputably more than necessary to effectuate the ... purposes of punishment and deterrence."). Furthermore, this penalty is less than half the size of the compensatory damages awarded, even though Illinois courts have routinely approved punitive awards far in excess of compensatory damages. *See, e.g., Ford,* 316 Ill.App.3d at 733–35, 249 Ill.Dec. 942, 737 N.E.2d 332 (punitive damages 75 times greater than compensatory damages); *Ciampi v. Ogden Chrysler Plymouth, Inc.,* 262 Ill.App.3d 94, 112–13, 199 Ill.Dec. 609, 634 N.E.2d 448 (1994) (punitive damages 20 times greater than compensatory damages). The Court is not aware of, and defendants have not identified, any Illinois cases remitting an award of punitive damages as constituting an excessive portion of defendant's net worth where punitive damages were less than or equal to compensatory damages, as they are here.

■ As for federal due process considerations, "[s]tates necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case.... Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests [of punishment and deterrence] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *BMW of N. Am. v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

■ From a due process standpoint, "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," according to the Supreme Court, is the nature and extent of "reprehensibility," as indicated by such factors as whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513. In the instant case, the Court of Appeals agreed that the Uzans' conduct was intentional and repetitive, but observed that several of the *State Farm* factors do not appear to be present. *Uzan II,* 388 F.3d at 63–64. It is largely for this reason that this Court has reduced the punitive damages award, on this remand, from $2.1 billion to $1 billion. But in the broader sense, it is hard to imagine financial misconduct that was more reprehensible than that of the defendants here, perpetrating at an international level an immensely complicated fraud that inflicted severe economic injury and sought to make a mockery of the judicial proceedings in several different countries. *Cf. Gore,* 517 U.S. at 577, 116 S.Ct. 1589 ("infliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... can warrant a substantial penalty."); *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 468, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (Kennedy, J., concurring) ("... TXO acted with malice. The evidence at trial demonstrated that it acted ... through a 'pattern and practice of fraud, trickery and deceit' and employed 'unsavory and malicious practices' in the course of its business dealings with respondent.").

■ In addition to evaluating the reprehensibility of defendants' conduct, the Court of Appeals directed this Court to consider the extent to which an award of punitive damages is necessary to deter defendants and future wrongdoers. *See Uzan I,* 388 F.3d at 64, *quoting Gore,* 517 U.S. at 582, 116 S.Ct. 1589; *see also*

*Williams v. New York,* 508 F.2d 356, 360 (2d Cir.1974). In this vein, punitive damages may be particularly appropriate where, as here, an injury is hard to detect. *See Uzan I,* 388 F.3d at 64, *quoting Gore,* 517 U.S. at 582, 116 S.Ct. 1589; *Ciraolo v. City of New York,* 216 F.3d 236, 243 (2d Cir.2000) (Calabresi, J., concurring). Indeed, it took Motorola years of effort to discover the huge fraud here perpetrated.

■ The same rationale that supports awarding punitive damages when an injury is difficult to detect also supports awarding punitive damages when damages are difficult to recover, as they are here. In both cases, a wrongdoer may not bear the full cost of his actions, and so will engage in a socially inefficient cost-benefit calculus. *Cf. id.* at 243 ("Punitive damages can ensure that a wrongdoer bears all the costs of its actions, and is thus appropriately deterred from causing harm, in those categories of cases in which compensatory damages alone result in systematic underassessment of costs, and hence in systematic underdeterrence."). For this reason, "charging a thief the cost of what he had stolen would not adequately deter theft unless the thief was caught every time." *Id.* at 244. Similarly, the individual defendants here, who have contemptuously resisted enforcement of this Court's prior judgment in every respect, are not likely to voluntarily pay much, if any, of the compensatory damages awarded. The Court therefore elects to impose punitive damages that will, among other things, help to deter this sort of behavior.

■ Given the reprehensibility of defendants' conduct and the scope of their fraud, the Court has no doubt that defendants had adequate notice that they would be subject to such a punishment if caught. Thus, this $1 billion award is not "grossly excessive" under the Due Process Clause. Furthermore, for the reasons articulated above, this punitive award will ensure that defendants and future wrongdoers who hope to escape liability know that, if caught, they will face an appropriately stiff penalty.

For the foregoing reasons, the Court hereby awards Motorola the sum of $1 billion in punitive damages from the individual defendants, jointly and severally.

SO ORDERED.