06-1222-cv
Motorola Credit Corp. v. Uzan

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

————————————————————————

August Term, 2006

(Argued: May 3, 2007)                    Decided: November 21, 2007)

Docket No. 06-1222-cv

————————————————————————

MOTOROLA CREDIT CORPORATION,

*Plaintiff-Counter-Defendant-Appellee*,

NOKIA CORPORATION,

*Plaintiff-Counter-Defendant*,

v.

KEMAL UZAN, CEM CENGIZ UZAN, MURAT HAKAN UZAN, MELAHUT UZAN,
AYSEGUL AKAY, and ANTONIO LUNA BETANCOURT,

*Defendants-Appellants*,

CEM CENGIZ UZAN and MURAT HAKAN UZAN,

*Defendants-Counter-Claimants-Appellants,*

UNIKOM ILETISM HIZMETLERI PAZARLAMA A.S., STANDART PAZARLAMA A.S. and
STANDART TELEKOMUNIKASYON BILGISAYAR HIZMETLERI A.S.,

*Defendants*,

CREDIT LYONNAIS, UBS AG and BRUCE G. HOWELL, ABN AMRO BANK N.V.,

*Movants*,

1

MOTOROLA INC., KROLL ASSOCIATES, INC., CHRISTOPHER B. GALVIN, KEITH J. BANE, WALTER KEATING, ED HUGHES, and ERNST KRAMER.

*Counter-Defendants.*

_____

Before: WINTER, CALABRESI, and SOTOMAYOR, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*), awarding punitive damages of $1 billion jointly and severally against Defendants-Appellants.

Affirmed.

HOWARD H. STAHL (Steven K. Davidson & Bruce C. Bishop *on the brief*), Steptoe & Johnson LLP, Washington, D.C., *for Plaintiff-Counter-Defendant-Appellee*.

RYAN E. BULL (R. Stan Mortenson & Benjamin E. Kringer *on the brief*), Baker Botts LLP, Washington, D.C., *for Defendants-Appellants*.

_____

CALABRESI, *Circuit Judge*:

In this appeal, the Uzan family of Turkey challenges the district court's award of $1 billion in punitive damages against it. The court based the punitive damages award on its findings that appellants "engaged in a coordinated campaign of lies and misrepresentations in order to swindle Motorola of more than $2 billion" and that, "threatened with exposure, [appellants] resorted not only to further lies and corporate manipulations but even to obstruction of justice and, ultimately,

misrepresentations to this Court." *Motorola Credit Corp. v. Uzan*, 413 F. Supp. 2d 346, 349 (S.D.N.Y. 2006) ("*Uzan V*").[1]

Appellants argue that the punitive damages assessed constitute "an economic death sentence that neither Illinois law nor the Constitution permit." They challenge the award as invalid under Illinois law because the "punitive sanction . . . exceed[s] the defendants' ability to pay," and under the Due Process Clause because, they contend, the amount is excessive. They also assert that the district court erred in assessing the punitive damages jointly and severally against them. Appellee contests each of these propositions, arguing, first, that the court properly considered defendants' ability to pay and that the Uzans cannot challenge this determination after "contumaciously" refusing to provide information as to their financial condition; second, that the "reprehensibility" of the Uzans' fraud, and the need to deter this kind of malicious misconduct, justify the size of the award under the Due Process Clause; and third, that defendants have waived any challenge to the joint and several assessment of the damages.

We affirm the district court's punitive damages award.

---

[1] Today's determination is the sixth published decision in this case. *See also Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003) (per curiam) ("*Uzan I*"); *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481 (S.D.N.Y. 2003) ("*Uzan II*"); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004) ("*Uzan III*"); *Nokia Corp. v. Uzan*, 425 F.3d 1005 (2d Cir. 2005) ("*Uzan IV*").

# I. BACKGROUND

The circumstances giving rise to this action were set forth at length in a comprehensive opinion by the district court, *Uzan II*, 274 F. Supp. 2d 481 (S.D.N.Y. 2003), and in an equally thorough opinion of this circuit which affirmed *Uzan II* in part and vacated and remanded it in part. *Uzan III*, 388 F.3d 39 (2d Cir. 2004). *See also Uzan I*, 322 F.3d 130 (2d Cir. 2003) (per curiam). We assume familiarity with those opinions, and recite only briefly the facts and history of this case.

Plaintiff Motorola Credit Corporation ("Motorola"), the financing arm of the cellular telecommunications manufacturer Motorola, Inc., and plaintiff Nokia Corporation ("Nokia"), also a leading cellular telecommunications company, sued five individual members of the Uzan family, a close associate of theirs, named Antonio Luna Betancourt, and several of their companies. Allegedly one of the richest families in the world, the Uzans are said to control more than 130 companies, ranging from banks and construction companies to utilities, media outlets, and communication firms. *Uzan II*, 274 F. Supp. 2d at 490, 526-30. Several of these family-owned companies—Unikom Iletism, Standart Pazarlama A.S., Standart Telekom, and a large Turkish telecommunications firm called Telsim—were defendants in the action at bar. These corporate defendants have not appealed the lower court decision. Accordingly, appellants are the individual Uzans (Kemal Uzan, Cem Uzan, Hakan Uzan, Melahut Uzan, and Aysegul Akay) along with their close family associate, co-defendant Betancourt.[2]

In *Uzan II*, the district court concluded that defendants fraudulently obtained loans from Motorola for more than $2 billion and from Nokia for approximately $800 million, purportedly to

---

[2] Though we refer interchangeably to appellants as "the Uzans," such references should be considered to include Betancourt.

finance the development of the Uzans' telecommunications business in the Telsim company. They secured this financing by granting plaintiffs shares in Telsim as collateral, inducing the loans through numerous "material false statements regarding the business practices and finances of Telsim, the value and security of the collateral, the uses to which prior loan proceeds had been put, the status of other financing for Telsim, the existence and value of offers to purchase an interest in Telsim, and the status of negotiations with third parties" to sell control of Telsim. *Id.* at 577. After procuring the loans, defendants severely diluted the value of the collateral by tripling the number of outstanding Telsim shares and creating a new privileged class of unencumbered shares with the power to elect a majority of Telsim directors.

After declaring Telsim in default on the loans, Motorola and Nokia filed their complaint in January 2002 alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, Illinois law, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1)(a), 2701(a)(2). Two months later, defendants moved to dismiss the complaint and to compel arbitration. The plaintiffs countered by asking the court to attach various New York properties belonging to the Uzans and to grant a preliminary injunction requiring the defendants to deposit in a district court registry the Telsim shares that they had pledged as collateral. In April 2002, before the court ruled on these motions, defendants secured three injunctions from courts in Turkey purporting to prohibit the transfer of Telsim stock outside the country; these injunctions were subsequently lifted by the Turkish courts.

In May 2002 the district court conducted a six-day evidentiary hearing and, by injunction, ordered defendants to deposit into the court's registry the shares of Telsim stock. Defendants refused, and instead canceled the voting rights of plaintiffs' collateral. The court deemed the loan agreements'

arbitration provisions to be irrelevant, having concluded that these governed litigation only against the Uzan companies and not against the individual defendants, who were the real parties in interest in the suit before the court.[3] Defendants appealed the injunction and the denial of their motion to compel arbitration. While these appeals were pending before our court, the district court proceeded to a bench trial despite defendants' refusal to recognize the jurisdiction of the court and to participate in discovery.

In March 2003, our court ruled on a consolidated appeal that considered both the preliminary injunction ordering the transfer of stock into the court registry and the arbitration decision. *Uzan I*, 322 F.3d 130. We concluded that the RICO claims underpinning the preliminary injunction had to be dismissed as unripe. *Id.* at 135. But we did not vacate the injunction. Instead, we remanded the case to permit the district court to determine whether supplemental jurisdiction over state law claims was an appropriate basis for the injunction. *Id.* at 137. On remand in July 2003, Judge Rakoff issued a 173-page opinion responding to our court. *Uzan II*, 274 F. Supp. 2d 481. The court exercised supplemental jurisdiction, and made findings of fact and conclusions of law. Based on these findings, the court awarded plaintiffs $2,132,896,905.66 in compensatory damages and an equal sum in punitive damages; it imposed a constructive trust on 73.5% of the shares of Telsim as the functional equivalent of the original Telsim shares that had been the plaintiffs' collateral; and it issued a variety of other injunctions. *Id.* at 580-82. At the same time, it denied defendant's motion for reconsideration of the arbitration ruling. *Id.* at 509.

In light of defendants' conduct, the court reached "the single and overwhelming inference that [the Uzans] never had any intention to fully and fairly litigate this matter, or to abide by the rule

---

[3] None of these first district court orders were memorialized in a published opinion.

6

of law or to do anything but thumb their noses at the Courts of the United States." Consequently, to enforce its specific stock transfer order, the court imposed a "contingent sanction" providing that:

> Defendants have already been found to be in contempt of the Court's prior orders regarding the transfer of stock. Since Nokia has no meaningful remedy for the fraud perpetrated upon it other than the constructive trust . . ., if defendants now fail to transfer . . . the requisite Telsim shares to the Court's registry on behalf of Nokia within one week from the entry of judgment, the Court hereby orders that judgment will automatically then enter requiring defendants (jointly and severally) to pay to Nokia two times the full amount outstanding on the loans extended by Nokia to Telsim . . . for a grand total of $1,707,415,278.26.

*Id.* at 582. With post-judgment interest taxed according to federal law, this contempt judgment entered against the Uzans and in favor of Nokia amounted, as of January 19, 2005, to approximately $1.735 billion. *Uzan IV*, 425 F.3d at 1007. In *Uzan IV*, we upheld the contempt judgment on the ground that the Uzans had failed to appeal that judgment in *Uzan III. Id.* at 1008. Contemporaneously, Turkish authorities estimated that the Uzans had also embezzled some $6 billion from a bank under their control, and the Turkish government placed a number of Uzan-led companies in receivership while ordering the arrest of defendants Kemal and Hakan Uzan. *Uzan V*, 413 F. Supp. 2d at 348 n.1.

Although, in *Uzan III,* we affirmed the compensatory damages award, we also there concluded that the district court's punitive damages award in excess of $2 billion could not "be squared with federal or Illinois law." 388 F.3d at 62.[4] We noted that the district court's decision

_____

[4] This decision resolved a wide range of disputes. In it, we affirmed the court's denial of the motion to compel arbitration; upheld the district court's exercise of supplemental jurisdiction over plaintiffs' state law claims; affirmed the court's conclusion that plaintiffs' fraud claims were ripe for adjudication under Illinois law; upheld the court's exercise of personal jurisdiction over defendants; vacated the court's imposition of a constructive trust; and vacated and remanded the court's punitive damages judgment for reconsideration under Illinois law and the Due Process Clause. *Uzan III*, 388 F.3d at 65-66.

7

setting the $2 billion punitive award "made no reference to" the factors identified by the Supreme Court and by Illinois law as relevant to the inquiry. *Id.* at 63, 65. But we also stated that "some punitive damages award is appropriate." *Id.* Accordingly, we "vacate[d] the District Court's punitive damages award, and remand[ed] to the District Court to recalculate the award[,] . . . consider[ing], *inter alia*, the nature of the harm caused by defendants, the need to deter other potential perpetrators from engaging in activity similar to defendants', and defendants' capacity to pay whatever award is assessed." *Id.* at 64-65.

On remand, the district court found that "the individual defendants, jointly and severally, engaged in a coordinated campaign of lies and misrepresentations in order to swindle Motorola of more than $2 billion, which they then converted to their own joint and several benefits." *Uzan V*, 413 F. Supp. 2d at 349. During additional discovery allowed by the court, Motorola served document requests, interrogatories, and notices of deposition—but defendants produced nothing in response.[5] The Uzans refused to provide information about their assets or their net worth for a punitive damages hearing, and failed to comply with orders to be deposed for both pre- and post-judgment discovery. Instead, they proffered excuses which the district court deemed so "ludicrous" and "palpably implausible" that it concluded that "the degree to which defendants have misled this Court is, frankly, unparalleled in this Court's experience." The court ruled that the Uzans' refusal to comply with discovery warranted an adverse inference against them. And on all of these grounds, the court determined, once again, that a very substantial punitive damages award was warranted under state

---

[5] In *Uzan III* we observed that defendants also refused orders issued by the English High Court of Justice that froze and required the disclosure of the Uzans' assets. The English court sentenced four of the Uzans to imprisonment for their contempt (Cem Uzan and Aysegul Akay remain subject to arrest). *See Uzan II*, 274 F. Supp. 2d at 570; *Uzan III*, 388 F.3d at 45 n.2.

and federal law. After considering the factors relevant under Illinois law and the Due Process Clause, however, the court reduced the earlier punitive damages award to $1 billion.[6] *Uzan V*, 413 F. Supp. 2d at 353.

## II. DISCUSSION

This case requires us to determine whether, under applicable federal and state laws, the district court properly assessed punitive damages against appellants in the amount of $1 billion.

While federal law governs the procedural standards for our review of the district court's punitive damages award, the court was required to set the award according to the substantive law of Illinois. As the Supreme Court held in *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*:

> In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the [fact-finder] may consider in determining their amount, are questions of state law. Federal law, however, will control on those issues involving the proper review of the [fact-finder's] award by a federal district court and court of appeals.

492 U.S. 257, 278-79 (1989) (footnote omitted); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 419 (1996).

Accordingly, the district court, in awarding punitive damages, sought to apply the factors relevant under Illinois law. As an Illinois appellate court would when hearing a state law-based challenge to the amount of a punitive damages award, we defer heavily to the trial court's application of Illinois law to the facts before it, and will not reverse "unless the manifest weight of the evidence

---

[6] It did not examine the other issues our court remanded in *Uzan III*—the availability of a constructive trust, and the enforceability of the judgment against other Uzan companies—in view of Motorola's decision to forego these forms of relief.

9

shows that the assessment was so excessive as to demonstrate passion, partiality, or corruption on the part of the decision-maker." *Franz v. Calaco Dev. Corp.*, 818 N.E.2d 357, 373 (Ill. App. Ct. 2004).

In addition, we must review the court's punitive damages award for excessiveness under the Due Process Clause, and that we do *de novo*. *Cooper Indus.*, 532 U.S. at 436 ("[C]ourts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards."). In this re-examination, however, we defer to the district court's findings of fact unless they are clearly erroneous. *See United States v. Bajakajian*, 524 U.S. 321, 336 n.10 (1998).

**A. Challenge To The Punitive Damages Award Under State Law**

Under Illinois law, punitive damages are "not favored," but are validly imposed "when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola Inc.*, 74 Ill. 2d 172, 186, 189 (1978). According to the Illinois Supreme Court, the purpose of a punitive award is "to punish the wrongdoer and to deter that party, and others, from committing similar acts in the future." *Deal v. Byford*, 127 Ill. 2d 192, 203 (1989). The *Deal* court identified three factors to be considered in evaluating the size of a punitive damages award:

> Relevant circumstances . . . include [(1)] the nature and enormity of the wrong, [(2)] the financial status of the defendant, and [(3)] the potential liability of the defendant. Those circumstances are not, however, exhaustive. It is vital that each case be carefully assessed in light of the specific facts involved, and the ultimate determination should be governed by the circumstances of each particular case.

*Id.* at 204 (internal citation omitted).

It is beyond cavil that, under the first *Deal* factor, the nature and enormity of the wrong in this case justify a punitive damages award. The district court imposed punitive damages based on (a) its extensive findings of the Uzans' fraudulent scheme to bilk Motorola of over $2 billion, and (b) the Uzans' obstruction, in the face of a bevy of court orders, of all attempts to redress these actual damages. *Uzan V*, 413 F. Supp. 2d at 349. The court concluded that it was "obvious . . . that defendants' conduct was fraudulent, willful, and malicious, evincing a wanton and deliberate disregard for Motorola's rights and *well warranting punitive damages under Illinois law*." *Id.* (emphasis added). The court also found it "beyond question that the defendants' fraud was enormous, both in amount and in the defendants' brazen resort to all kinds of reprehensible misconduct to achieve their ends." *Id.* at 350. Indeed, in *Uzan III* we expressly "agree[d] with the District Court that, on this record, some punitive damages award is appropriate," 388 F.3d at 63, but we remanded to the district court for reconsideration of the *size* of the award, according to the factors relevant in Illinois law and our due process analysis. *Id.* Our concern was with the district court's consideration of defendants' ability to pay, pursuant to the second *Deal* factor, and it is on this factor that appellants focus, in the Illinois law part of their appeal.

Appellants' principal argument is that the "punitive damage award of $1 billion . . . far exceeds the total assets of the Appellants [and] [f]or that reason alone, the award must be vacated." Or, as they elsewhere put it: the punitive award violates Illinois law "because it exceeds appellants' net worth." Their contention relies on a decision of the Illinois Appellate Court which, construing the second *Deal* factor, stated:

> [A]n award which bankrupts the defendant is excessive. Punitive damages should be large enough to provide retribution and deterrence but should not be so large that the award destroys the defendant.

11

> Thus, before a court can gauge the award, it must first gauge the financial position of the wrongdoer. . . . Simply stated, the amount of the award should send a message loud enough to be heard but not so loud as to deafen the listener. A deafening award is excessive.

*Hazelwood v. Ill. Cent. Gulf R.R.*, 114 Ill. App. 3d 703, 713 (App. Ct. 1983) (internal citations omitted) (emphasis added).

Invoking *Hazelwood*, the Uzans dispute any award of punitive damages. They assert that "[i]t is now abundantly clear from the record that the Appellants lack the assets to pay *any* punitive damages award, which makes an award of *any* punitive damages improper under Illinois law." Motorola, however, asserts that there is no valid evidence that the Uzans will suffer financial destruction as a result of the punitive award. It notes that the "[d]efendants . . . have refused to produce a single iota of evidence regarding their net worth" despite every accommodation by the district court. Motorola further argues that, in Illinois, defendants—not plaintiffs—bear the burden of providing evidence of their financial status.

In *Uzan III*, we resolved this issue of Illinois law.[7] We rejected the plaintiffs' contention that defendants' failure to meet their burden necessarily validates any amount of punitive damages. 388 F.3d at 64 ("Plaintiffs would have this Court conclude that, once defendants failed to establish their net worth in the District Court, *any* punitive damages award could be assessed against them under Illinois law. We reject this view."). We stated, however, that while the financial position of the

---

[7] Illinois does not permit certification of questions of state law to its Supreme Court from our court. *See* Ill. Sup. Ct. R. 20(a) ("When it shall appear to the Supreme Court of the United States, or to the United States Court of Appeals for the Seventh Circuit, that there are involved in any proceeding before it questions as to the law of this State, which may be determinative of the said cause, and there are no controlling precedents in the decisions of this court, such court may certify such questions of the laws of this State to this court for instructions concerning such questions of State law, which certificate this court, by written opinion, may answer."). Accordingly, we are left to our own devices in interpreting Illinois law.

wrongdoer must be considered, "[p]laintiffs are correct that, under Illinois law, defendants bear 'the burden of putting on' relevant evidence of net worth in objecting to a punitive damage assessment." *Id.* (quoting *Ford v. Herman*, 316 Ill. App. 3d 726, 734 (App. Ct. 2000)).

As a result, the only question of Illinois law before us today is whether the district court, on remand, gave proper "consideration [to the] *defendants' ability to pay such a hefty sum*." *Uzan III,* 388 F.3d at 64 (emphasis added). And, while the Uzans' failure to establish their net worth does not render the punitive damages award limitless, neither we nor the Illinois courts have found that a defendant's financial condition can provide a dispositive basis for precluding any punitive award at all. Rather, as the Illinois Supreme Court has held:

> Contrary to the defendant's assertion, the absence of any evidence regarding their financial status does not mean that the [fact-finder's] award must be set aside. *Evidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge or jury in determining an appropriate award of punitive damages. . . . Defendants made no attempt to [present such evidence, and they] cannot now complain of its absence.*

*Deal*, 127 Ill. 2d at 204-05 (emphasis added).

The district court made every effort to determine defendants' financial condition based on all available sources. It did so in the face of the Uzans' refusal to help in any meaningful way. The court found that a reasonable estimate of appellants' net worth was at least $5 billion. *See Uzan V*, 413 F. Supp. 2d at 350-51. It began with a *Forbes* estimate that the Uzans' net worth was $1.5 billion in 2004. The court noted that while the *Forbes* figure reflected "rough estimates at best, [they] were made by a disinterested third party" and "were almost certainly under-estimates because they did not take account of the evidence that subsequently came to light of the defendants' huge embezzlements." *Id.* at 350 (citing *Forbes Billionaires List,* Assoc. Press, Feb. 27, 2004).

13

In this respect, the court referred to its earlier finding in *Uzan II*, based on the undisputed conclusions of the Samuel Report, *see Uzan II*, 274 F. Supp. 2d at 559 (citing Report of Antony B. Samuel, Forensic Services Practice, Pricewaterhouse Coopers, January 2003, at 4), that the "individual defendants had converted to their own use a substantial part of the $2 billion stolen from Motorola," that is, at least $1.135 billion. *Uzan V*, 413 F. Supp. 2d at 350-51. In addition, the court, relying on a wide range of news sources, found that the Uzans also possessed or jointly controlled between $5 billion and $6 billion in assets allegedly stolen from the Turkish bank Imar.[8] It then observed that the Turkish government had seized certain of the Uzans' Turkish assets, the value of which was unascertainable in light of the absence of information from the Uzans. But the court concluded that "the secretive and labyrinthine manner in which the individual defendants operated their complex financial empire makes it likely that they retain access to substantial assets even while some of them are occupying fugitive status." *Id.* at 351 (citing *Press Scanner,* Turkish Daily News, Jan. 17, 2006 (summarizing reports that the Uzans are currently "living like kings" in Jordan, where

---

[8] The district court cited numerous sources for its finding that "the Turkish government charged certain of the Uzans with embezzling more than $5 billion in connection with an entirely separate $6 billion bank fraud." *Uzan V,* 413 F. Supp. 2d at 351. *See* Catherine Collins & David Greising, *Uzan Says He Sought Deals; Motorola Lawyer Dismisses Offers,* Chi. Trib., Mar. 2, 2004, at C1 ("Uzan's father, Kemal, and his brother, Hasan, have been fugitives since the Turkish government last summer accused them of pilfering the $5.8 billion from Imar Bank."); *Turkish Regulator Rejects Uzan's Debt Repayment Plan,* Dow Jones Int'l News, Mar. 12, 2004 ("An investigation found that some $6 billion in Turkish lira and foreign currency had been deposited at the bank without any record and was used by the controlling shareholders. The government started repaying depositors in January, labelling the Imar case as 'the biggest bank robbery in history.'"); *Turkey Seizes 219 Companies Of Uzan Family,* N.Y. Times, Feb. 16, 2004, at C5 ("Turkey has accused leading members of the family, including the patriarch Kemal Uzan, of involvement in a multibillion-dollar bank fraud."); David Greising, *Motorola, Turkey Chase Family for Missing Billions,* Chi. Trib., Dec. 28, 2003, at C1 ("The Turkish government believes the Uzans siphoned $5.2 billion from a bank they owned, Imar Bankasi."); *WEEK,* Turkish Probe, Dec. 14, 2003 ("Foreign Minister Abdullah Gul says Turkey has asked the United States to extradite members of the controversial Uzan family, accused in Turkey of involvement in a multi-billion dollar fraud in the collapsed Imar Bank.").

14

a Vatan reporter says he has uncovered evidence of six new companies formed by the Uzan family) (internal citation omitted)).

Under the circumstances, we cannot say that the court's estimate that the Uzans' net worth was *at least $5 billion*, *Uzan V,* 413 F. Supp. 2d at 351, was erroneous. Nor can we fault its additional conclusion:

> All of this suggests that the individual defendants, jointly and severally, remain billionaires and should be able to satisfy a very substantial punitive damages award. Given the reprehensibility of the individual defendants' concerted conduct, the size of their fraud, and their seeming ability to pay, and taking account the goals of punishment and deterrence, the Court finds that an award of $1 billion in punitive damages is necessary and permissible under Illinois law.

*Id.*

Appellants contest the district court's estimate of their net worth and particularly the court's treatment (a) of their access to funds embezzled from the Imar bank, and (b) of their liabilities to the Turkish government. But, in doing the best it could to determine the relevant figures, the court properly considered the Uzans' refusal to provide any evidence that the Turkish government froze Uzan assets or the value of such possibly frozen assets. Defendants' counsel conceded that defendants would never comply with deposition or document production orders that sought such information. He stated: "[T]he individual defendants are not and will not be responding substantively to the interrogatories. . . . The same will hold true with regard to the deposition." Moreover, in the punitive damages hearing on remand, when pressed by the court to provide evidence demonstrating the Turkish government's seizure of assets or evidence rebutting the court's estimate of assets embezzled by the Uzans from the Imar bank fraud, defendants' counsel said: "[T]he bottom line is that I know that because the defendants have not produced any evidence of their net worth that your

Honor can look at various indicia and say I think that this is an appropriate indication of their net worth and we will have nothing to rebut it because we have nothing in the record."

The court also reasonably rejected the Uzans' assertion that they simply could not "state the amount of [their] net worth" because the term "net worth" is "open to multiple interpretations." As the court observed, "there was a whole cavil over the meaning of the net worth which is really about as plain vanilla and straightforward a term as one could imagine in this context." The court offered every accommodation, including "a videotape deposition" for any individual defendants legitimately prohibited from leaving Turkey, and warned that if they refused this option "the adverse inference should arise and they should know up front that that would be the price that they would be paying."

We have deemed such adverse inferences to be proper in similar contexts. *See* Fed. R. Civ. P. 37(d); *Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 373 (2d Cir. 1988) ("The incompleteness of the record as to [defendant's] net worth is not a basis for reducing the punitive damages award against him, for it is the defendant's burden to show that his financial circumstances warrant a limitation of the award."); *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978) ("It is true that without . . . evidence [of defendant's net worth] no one can be sure of the severity of the monetary sanction that the jury imposed. A $60,000 award may bankrupt one person and be a minor annoyance to another. But the decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this considered in mitigation of damages."). Adverse inferences are also in complete accord with Illinois law that, where defendants refuse to present evidence of net worth, they must take the consequences. *See Deal*, 127 Ill. 2d at 204-05.

16

Having found the Uzans' net worth to be "at least $5 billion," the court observed that an "award [of] 20% of their net worth [is] considerably less than Illinois courts have approved." *Uzan V,* 413 F. Supp. 2d at 351; *see also Motsch v. Pine Roofing Co.*, 178 Ill. App. 3d 169, 177-78 (App. Ct. 1989) (upholding punitive award that was 37% of net worth); *Nat'l Bank of Monticello v. Doss*, 141 Ill. App. 3d 1065, 1074 (App. Ct. 1986) (imposing punitive award that was 71% of net worth); *cf. In re New Orleans Train Car Leakage Fire Litig.*, 795 So. 2d 364, 388 (La. Ct. App. 2001) ("The $850 million punitive damages award is about 18% of CSX's net worth. We do not find that percentage to be an abuse of discretion in this case because we cannot say that 18% is indisputably more than necessary . . . ."). The court further noted that the $1 billion punitive award, being less than half of the compensatory damages awarded, was entirely consistent with Illinois holdings in this respect as well. *Uzan V*, 413 F. Supp. 2d at 352 (citing *Ford*, 316 Ill. App. 3d at 733-35 (affirming punitive damages 75 times greater than compensatory damages); *Ciampi v. Ogden Chrysler Plymouth, Inc.*, 262 Ill. App. 3d 94, 112-13 (App. Ct. 1994) (upholding punitive damages 20 times greater than compensatory damages)).

\* \* \* \* \*

The district court properly considered the best available evidence of defendants' financial status, as required by Illinois law and by our decision in *Uzan III*. Appellants have made no showing that the district court's award was the product of passion, partiality, or corruption. And they have failed to demonstrate that the award exceeds their ability to pay. Therefore, we conclude that the modified punitive damages award of $1 billion is valid under Illinois law.

17

**B. The Punitive Damages Award Under The Due Process Clause**

The Supreme Court has held that the Due Process Clause prohibits the States from imposing "grossly excessive" punitive damages on tortfeasors, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996). The Court has identified three "guideposts" for assessing constitutional excessiveness:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the [fact-finder] and the civil penalties authorized or imposed in comparable cases.

*Uzan III*, 388 F.3d at 63 (quoting *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)); *see also Gore*, 517 U.S. at 574-75. Two features of this framework bear emphasis. First, to date, the defendant's financial status has occupied no place in the Supreme Court's due process review. Second, the Court has said that "the most important indicium of the [award's] reasonableness . . . is the degree of reprehensibility of the defendant's conduct." *Id.* at 575.

In the case before us, the other two guideposts are not sources of concern. Indeed, earlier, when the compensatory and punitive damages were equal, at approximately $2 billion, we said "[t]here [wa]s no disparity between the size of the award and the actual harm suffered . . . (a 1:1 ratio)." *Uzan III*, 388 F.3d at 63 n.19. And, we added, "although the award [was] 42,000 times the penalty provided by Illinois' Deceptive Business Practices Act, . . . defendants do not seriously argue that that statute . . . is 'comparable' to the common law fraud claims here." *Id*. Our constitutional inquiry, therefore, centers on the degree of reprehensibility of defendants' conduct.

As to reprehensibility, the Supreme Court has said:

We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-77). In *Uzan II*, the district court did not expressly apply these factors. Instead "it simply stated without elaboration that 'considering the reprehensibility of defendants' conduct . . . the Court perhaps would be justified in imposing an award of punitive damages several fold the amount of actual damages awarded.'" *Uzan III*, 388 F.3d at 63 (quoting *Uzan II*, 274 F. Supp. 2d at 581)). As a result, in *Uzan III*, when we remanded to the district court to reconsider the size of the award, we asked the court to "bear in mind that the harm caused by defendants was not 'physical as opposed to economic,'" that defendants "did not directly endanger the health and safety of others (except, perhaps, insofar as they induced Turkish authorities to arrest executives based on trumped up charges)," and that plaintiffs "were arguably not 'financially vulnerab[le].'" *Id.* at 63-64.

On remand, the district court did just that. It specified that because the defendants' conduct was intentional and repetitive, but did not appear to implicate the other *State Farm* factors, "this [c]ourt has reduced the punitive damages award . . . from $2.1 billion to $1 billion." *Uzan V*, 413 F. Supp. 2d at 352. In assessing this amount the court relied on the expansive record adduced in its 173-page opinion in *Uzan II*. And it expressly found that:

[I]n the broader sense, it is hard to imagine financial misconduct that was more reprehensible than that of the defendants here, perpetrating at an international level an immensely complicated fraud that inflicted severe economic injury and sought to make a mockery of the judicial proceedings in several different countries.

19

*Id.* (citing *Gore*, 517 U.S. at 577). The court provided additional support for this finding in its earlier, *Uzan II*, opinion where it described the scope of this egregious conduct:

> [T]he defendants—in particular, the members of the Uzan family—have perpetrated a huge fraud. Under the guise of obtaining financing for a Turkish telecommunications company, the Uzans have siphoned more than a billon dollars of plaintiffs' money into their own pockets and into the coffers of other entities they control[led]. Having fraudulently induced the loans, they have sought to advance and conceal their scheme through an almost endless series of lies, threats, and chicanery, including, among much else, filing false criminal charges against high level American and Finnish executives, grossly diluting and weakening the collateral for the loans, and repeatedly disobeying the orders of [the district] Court.

*Uzan II*, 274 F. Supp. 2d at 490.

We find unpersuasive appellants' suggestion that a purely economic injury to a sophisticated financial entity cannot form the basis of a substantial punitive damage award. Nor is there any basis to appellants' contention that the district court failed "to weigh properly the economic nature of the fraud and the sophistication of the corporate victim." For it was precisely on these bases that the district court explained its *reduction* of the punitive award from $2.1 billion to $1 billion. *Uzan V*, 413 F. Supp. 2d at 352. And the Supreme Court has stated unequivocally that a purely economic injury can justify a substantial award. Thus, in *Gore*, it said that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct . . . can warrant a substantial penalty." 517 U.S. at 576. [9]

---

[9] Appellee asserts that the Uzans' conduct was "not purely economic" because they also "openly tried to extort [Motorola] by threatening, and then bringing, false criminal charges against Motorola executives. . . . [T]hese charges threatened more than economic harm: they threatened those executives' liberty and physical safety." We acknowledged this prospect in *Uzan III*, stating that "defendants did not directly endanger the health and safety of others (*except, perhaps, insofar as they induced Turkish authorities to arrest executives based on trumped up charges*)." *Uzan III*, 388 F.3d at 63-64 (emphasis added); *see also id.* at 44 ("The District Court found that, in addition to diluting and destroying the plaintiffs' collateral, defendants filed false criminal charges against plaintiffs'

\* \* \* \* \*

The Supreme Court has said that "[o]nly when an award can fairly be categorized as 'grossly excessive' . . . does it enter the zone of arbitrariness that violates the Due Process Clause." *Gore*, 517 U.S. at 568. The award in this case, despite its size, cannot be deemed grossly excessive.[10] We conclude that the court's determination of the punitive damages award comports with the Due Process Clause.[11]

---

senior executives, claiming that the executives engaged in 'explicit and armed threat[s] to kill,' blackmail, and kidnap members of the Uzan family. These charges were later dismissed by the Turkish criminal court on the ground that they lacked a factual basis."). Because the economic damages caused by the Uzans' fraud justified the punitive award, we need not address this contention.

[10] In *State Farm*, the Court stated that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." 538 U.S. at 425. Here, the punitive damages assessed were half the substantial compensatory damages figure. The High Court's statement in *TXO Prod. Corp. v. Alliance Res. Corp.* bears repeating:

> The punitive damages award in this case is certainly large, but in light of the amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth, we are not persuaded that the award was so "grossly excessive" as to be beyond the power of the State to allow.

509 U.S. 443, 462 (1993) (plurality op.) (footnote omitted).

[11] The court in this case did not base the punitive award on appellants' harm to nonparties, or "strangers to the litigation." *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007). Rather, appellants were only punished for their actions toward appellee. This undisputed fact distinguishes the instant case from those in which the Supreme Court raised procedural due process concerns. *See, e.g., Phillip Morris*, 127 S.Ct. at 1063; *Gore*, 517 U.S. at 574-75. In this case, the court did not improperly amplify its findings of reprehensibility in the Uzans' conduct by considering harms to other parties.

21

**C. The Joint And Several Nature Of The Punitive Damages Award**

Appellants, *relying on Illinois law*, also challenge the district court's award of punitive damages "against the defendants, jointly and severally." *Uzan V*, 413 F. Supp. 2d at 353. That appellants did not raise this contention in the earlier appeal in *Uzan III* would not preclude our consideration of this claim. Our vacatur of the punitive damages award in *Uzan III* meant that the issue could still be raised below and in any subsequent appeal. *See Johnson v. Bd. of Educ.*, 457 U.S. 52, 53-54 (1982) (per curiam) ("Because we have vacated the Court of Appeals' judgments in this case, the doctrine of the law of the case does not constrain either the District Court or . . . the Court of Appeals.").

Nevertheless, because appellants failed to make this state law contention to the district court, they may not pursue it now. In a hearing before Judge Rakoff, the Uzans' counsel asked the district court to be "a little more particularized" in its punitive damages calculation. This request, however, was not based on the Illinois law of punitive damages. Rather, appellants asserted that "*due process* requires a bit of a more individualized approach to assessing punitive damages." (emphasis added). The district court was asked to consider how differences in the Uzans' individual conduct affected the constitutional permissibility of imposing such a large award on all of them.

Before us, appellants do not renew their due process argument, and so we deem it abandoned. *See Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142 (2d Cir. 2002). Instead, they press an alternative submission, relying on various state law cases for the proposition that punitive damages must be assessed separately against each defendant. As noted above, this state law challenge to joint and several liability was not presented to the district court. We therefore will not consider it here. *See, e.g., Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218 (2d Cir. 2006).

22

Consideration of appellants' challenge to joint and several liability would not, moreover, be "necessary to avoid manifest injustice." *See Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000) (internal quotation marks omitted). The Uzans are represented by sophisticated counsel, and they had ample opportunity properly to pursue the argument during these protracted proceedings. For their own reasons they opted not to do so. Accordingly, we can affirm the district court without deciding whether, as a matter of Illinois law, or under the federal constitution, that court was correct to order joint and several liability for punitive damages.

### III. CONCLUSION

The district court's punitive damages award against appellants is valid under both Illinois law and the Due Process Clause. On remand, the court properly applied the variety of factors relevant to state and federal law. Judge Rakoff's findings establish beyond cavil the extraordinary nature of the Uzans' wrongful behavior, and form a valid basis for the substantial punitive award of $1 billion against them. The district court's punitive damages judgment is therefore AFFIRMED.